**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**NEWPORT NEWS DIVISION**

**ANDREA E. JOHNSON, INDIVIDUALLY AND**
**AS PERSONAL REPRESENTATIVE OF THE**
**ESTATE OF THADDIUS A. JOHNSON,**
**DECEASED AND JENNIFER W. STEVENS,**
**ANCILLARY ADMINISTRATOR OF THE**
**ESTATE OF THADDIUS A. JOHNSON,**
**DECEASED,**

**Plaintiffs,**

**v.**                                                    **Case No. 4:18-cv-132-AWA-RJK**

**AIR & LIQUID SYSTEMS CORPORATION,**
**Successor by Merger to**
**BUFFALO PUMPS, INC., et al.,**

**Defendants.**
_____

**PATRICK A. LAUGHLIN**
**and DEBORAH J. LAUGHLIN,**

**Plaintiffs,**

**v.**

**AIR & LIQUID SYSTEMS**
**CORPORATION, Successor by Merger to**
**BUFFALO PUMPS, INC.,** *et al.*,

**Defendants.**

**PLAINTIFFS' OPPOSITION TO JOHN CRANE INC.'S**
**MOTION FOR SUMMARY JUDGMENT**

NOW COME Plaintiffs, by counsel, and oppose John Crane Inc.'s (JCI's) Motion for

Summary Judgment in this consolidated case. (ECF 205 (JCI's MSJ)). This Court should deny

JCI's MSJ on the Government Contractor Defense, and it should grant Plaintiffs' Motion for

Partial Summary Judgment on the JCI'S Sophisticated Purchaser and Government Contractor

Defenses for the reasons set forth below and the reasons set forth in Plaintiffs' *Memorandum in Support of Motion for Partial Summary Judgment on John Crane Inc.'s Sophisticated Purchaser and Government Contractor Defenses Pursuant to FRCP 56*, previously filed. (*See* ECF 209, 210 (Plaintiffs' MPSJ)).

## SUMMARY

Johnson's and Laughlin's strict liability and negligence claims against JCI are based on JCI's failure to warn them about asbestos hazards inherent in the products JCI supplied to the Navy. (4:18cv132, ECF 49, *Johnson* Amended Complaint; 4:18cv134, ECF 70, *Laughlin* Amended Complaint). JCI alleges the government contractor defense in both cases.[1] There is no genuine dispute of material fact regarding this defense, and it should be struck as a matter of law.

JCI claims that the Navy would not allow it to put warnings on the face of its gaskets and, therefore, it is immune under the government contractor defense. JCI cannot prove this defense as a matter of law because (a) JCI has disclosed no expert to contest the opinions of Plaintiffs' expert, Dr. Terry Spear, regarding the interpretation and effect of the Federal Hazardous Substances Act ("FHSA") and the Manufacturing Chemists' Association Manual L-1 (MCA L-1 Guide) as incorporated into DOD's MIL-STD-129, which, in turn was incorporated into the relevant gasket and packing specifications; (b) the only expert JCI disclosed to discuss the language and effect of the Navy gasket specifications admits that he relies solely on his own personal experience and knowledge; yet he admits he never had any experience with any of the specifications at issue; and (c) JCI's experts agree that the Navy was not aware of the hazards of asbestos gaskets and packing until at least 1975, but JCI still did not warn. Accordingly, this Court should deny JCI's MSJ and

---

[1] 4:18cv132, ECF 85 (Answer to First Amended Complaint in *Johnson*, at 17, ¶ 7 and 19, ¶ 18); 4:18cv134, ECF 81 (Answer to First Amended Complaint in *Laughlin,* at 17, ¶ 7 and 19, ¶ 18).

grant Plaintiffs' MPSJ.

**LOCAL RULE 56 (b) STATEMENT OF FACTS**

**A.  Preliminary Statement:**

JCI's MSJ centers on whether MIL-A-17472, HH-P-46D, HH-P-46E, and MIL-P-17303 ("the G&P specifications") prohibited JCI from including a warning on the face of its gasket material or on the packages of its valve packing. JCI's defense revolves around the improper interpretation of the procurement specifications and standards as they existed shortly before and during Plaintiffs' exposure periods, when the asbestos sheet gasket and packing materials that Plaintiffs used would have been sold to the Navy. This defense does not revolve around how many different brands of gasket or packing material was available, whether these products were on a qualified products list (QPL), how the G&P specifications were created, or the level of industry involvement in the creation of those specifications. Thus, most of the assertions in JCI's Statement of Undisputed Facts are not "material" to the resolution of JCI's MSJ or Plaintiffs' MPSJ. In contrast, the real material facts that are undisputed in this MSJ and in Plaintiffs' MPSJ are contained in Plaintiffs' Counterstatement of Undisputed Material Facts in Section C, below.

Additionally, many of JCI's statements are supported by the November 21 affidavit of its Corporate Representative, George Springs. Plaintiffs have moved this Court to disregard this affidavit under the sham affidavit rule because it directly conflicts Springs' sworn testimony during his deposition in these cases only two weeks *before* he signed the affidavit. (*See* ECF 223, 224). Accordingly, Plaintiffs object to statements based upon Springs' affidavit.

Finally, many of JCI's assertions appear to challenge Lowell's qualifications; however, there is no motion pending on Capt. Lowell, and Courts do not weigh the evidence at the summary judgment phase. On the other hand, Plaintiffs have moved to limit the testimony of JCI's expert,

3

Sargent, because (a) his Report does not comply with Rule 26 (A)(2)(b) on certain material issues; (b) he admitted he relies solely on his own experience but has no experience with the G&P specifications or MIL-STD-129; (c) he admitted he does not rely on any documents or other materials and stated that he has no reliance materials, and (d) admitted that his opinions would not change even if the documents referenced in his report were excluded. (*See* citations and exhibits cited in ECF 216, Plaintiffs' Memorandum in Support of Motion to Limit or Exclude RADM Sargent ("Memo Mot. Limit Sargent")). Because this Court may choose to request additional briefing and resolve that motion prior to deciding JCI's MSJ and Plaintiffs' MPSJ, Plaintiffs do point out where his opinions are unfounded in this Response.

   **B.  <u>Responses to JCI's Statement of Undisputed Facts.</u>**

   1.      Plaintiffs do not dispute Paragraphs 1-6 of JCI's Statement of Undisputed Facts.

   2.      Plaintiffs dispute paragraph 7 to the extent that it assumes that gasket material came in boxes. Springs has testified that JCI's gasket material was shipped on pallets or in rolls with kraft paper wrapped around the outside. (**Ex. 1**, *Springs Test. in Halsema v. JCI,* 4/4/06, at 90).

   3.      Plaintiffs' do not dispute Paragraphs 8-10.

   4.      Plaintiffs' dispute Paragraph 11 to the extent that the last sentence mischaracterizes Lowell's employment history. Lowell actually retired as General Manager of Bath Iron Work's Ship Repair Yard in Portland, Maine, in 1995. (**Ex. 2**, Report & Aff. of Lowell, at 3; *see also id.* at 2-6).

   5.      Regarding Paragraph 12, Plaintiffs admit that Lowell relies, in part, on portions of the testimony of Alvin Anceravage, Henry Murad, Adam Martin, and an additional DOD employee, Kenneth Nelson, for Lowell's opinions that MIL-STD-129 "set the 'minimum requirements' for package labels and that '[t]he contractor can put anything on a package.'" (**Ex.**

**2**, Report & Aff. of Lowell, at 17-18). Plaintiffs also admit that Lowell relies to a lesser degree on the testimony of John Haas and Allen Winer, but his reliance on their testimony is mainly limited to the fact that the military relied on industry to help develop specifications, which is not really at issue here. (**Ex. 3**, Excerpts of Lowell Depo, Vol. I, at 48-49).

6.      Regarding Paragraph 13, Plaintiffs do not dispute that Lowell signed an affidavit on March 9, 2001 stating that the Navy was "highly sophisticated concerning the makeup and properties of gaskets used on Naval warships." When Haas was asked the question, "Q. Would you consider the navy a sophisticated user of material," he actually responded, "I don't know what 'sophisticated' means when you are talking about buying things. Mr. Teuber: Has expertise in the type of products that it wants to buy. A. Yes." (ECF 206-17, at 170:16-26). Plaintiffs admit that Haas also discussed "cognizant technical code[s]" during his May 11, 1981, September 15, 1980, and October 27, 1982 depositions, and said these are people who are "expert on the mil-spec under their cognizance." He further testified that when he used the word "expert" he meant that "[h]e's an expert to the extent that a person can be an expert on all types of metals. . . . [H]e would try to have a composite knowledge, but quite obviously, the experts for any particular product, you know, you might equate him or her to perhaps 30, 40, 50 different experts outside [in industry], each of whom is a super expert in an individual area or an individual product." (**Ex. 4**, Haas Depo excerpts, 5-11-81, at 39-40).

7.      Regarding Paragraph 14, Plaintiffs do not dispute that the technical codes prepare the specifications, that the Navy may accept or reject industry suggestions, and that fed-specs may be written by multiple agencies. But JCI misreads Haas' testimony in the last sentence of Paragraph 14. He actually testified: "Q. Would it ever occur where an individual company would draft the specification for the cognizant technical code? A. I would guess it's possible. Q. Do you have any

knowledge of an instance where a company has drafted a specification for a technical code? A. Not specifically." (ECF 206-19, at 48). Additionally, Hass testified in 1981 that (a) when drafting a specification, the first thing the Navy did was to see if there was already an existing industry specification, such as an ASTM or ASME specification, that could be adopted; (b) that the Navy's engineers are in constant contact with industry technical societies and "don't work in a vacuum;" (c) that manufacturers could propose specifications to the Navy; and (d) that manufacturers routinely propose changes to specifications. (**Ex. 4**, Haas Depo excerpts, 5-11-81, at 32-39). According to Haas, "You never try to develop a new spec., either in-house or ask industry to do it, if something already exists. And, I say, most things are not new, surprisingly, maybe. Even ships are not new." (*Id.* at 39).

       8.       Plaintiffs do not dispute Paragraph 15.

       9.       Regarding Paragraph 16, Lowell agreed that gaskets and packing typically had to be on the QPL to be sold directly to the Navy. (ECF 206-14, at 59). The Anceravage testimony JCI quotes does not mention QPLs at all. (ECF 206-22, at 54). In the last two sentences, JCI cites page 58 of Lowell's deposition. While he agreed that goods were tested to determine whether they conform to the specification, he stated, "So as industry came up with new products the Navy would be privy to the test results and approve or disapprove qualified products lists and that's how new products came into being. I don't think the Navy could be anywhere near as active as the sum total of industry working in development of gasket material." (ECF 206-14, at 58). Later, Lowell agreed that "specifications for sheet packing and gasket material and other packing materials were largely written around off-the-shelf products that were already available." (**Ex. 5**, Lowell Depo, Vol II, at 147). Finally, Sargent testified recently in *Mullinex v. JCI* that gasket material did not have to be on the QPL to be used in the Navy, and that "a manufacturer could very well have a material that

fully met the specification, but choose not to submit it to the government for testing against a QPL" and it still could be used in the Navy. (**Ex. 6**, Sargent Depo in *Mullinex*, 11-18-19, at 61-62).

10.     Plaintiffs do not dispute Paragraph 17 with the caveat that, as JCI acknowledges in its brief, "each of the specifications at issue incorporated by reference MIL-STD-129's requirements for labeling." (ECF 206, at 1). Accordingly, JCI was required to look, not only at the G&P specifications, but also all documents incorporated into those specifications, including MIL-STD-129 and its own incorporated references, to determine the labeling of that product.

11.     Regarding Paragraph 18, Plaintiffs do not dispute that Anceravage stated that inspectors from the DLA may be sent to manufacturer's facilities to inspect goods. JCI claims that Sargent says the same, but the cited pages from his testimony do not bear this out. (*See* ECF 206-23, at 269:24-270:5; 271:11-271:16). Rather he states that inspectors would inspect in accordance with the specification. As with most off-the-shelf products, the G&P specifications at issue here delegated those inspections to the supplier of the product—i.e., JCI—stating: "Unless otherwise specified in the contract or purchase order, the supplier is responsible for the performance of all inspection requirements as specified herein." (ECF 206-27, at ¶ 4.1; *see also* ECF 206-28, at ¶ 4.1; ECF 206-29, at ¶ 4.1). Finally, Plaintiffs' object to JCI's reliance on the affidavit of George Springs, as set forth in the preliminary statement above.

12.     Regarding paragraph 19, Plaintiffs object to JCI's reliance on Springs' affidavit, as set forth above. Additionally, Springs did not start working at JCI's Morton Grove factory until 1998 and testified that he never spoke to the key JCI employees who handled government sales. (**Ex. 7**, Springs Depo. at 15-19). Plaintiffs do not dispute Martin's testimony set forth in this Paragraph; however, Martin continued by agreeing that he was not aware of anything in MIL-STD-129 that prohibited warnings on products. (ECF 206-26, at 20).

13.     Plaintiffs do not dispute Paragraphs 20 to 22.

14.     Plaintiffs object to Paragraph 23 because it is based solely on Springs' sham affidavit. Additionally, it is speculative because Springs admits that he had nothing to do with government sales until, at the earliest, 1998—thirteen years after JCI stopped selling asbestos gasket and packing products. He also admits that he never spoke to the key people involved in Navy sales during the applicable period, and only spoke to unidentified individuals in the past 15 years—after he retired from JCI—but those conversations only involved "general knowledge. No – nothing in particular." (**Ex. 7**, Springs Depo, at 15-21). Additionally, JCI destroyed all pre-1977 sales documents, purchase orders, or invoices, which includes all of Laughlin's exposure period and the majority of Johnson's exposure period. (**Ex. 7**, Springs Depo, at 167). So, Springs has no documentary evidence to rely upon with regard to Navy sales during that period.

15.     Regarding Paragraph 24, Plaintiffs do not dispute RADM Sargent's service history or the length of his single-spaced report. But Sargent testified that he relies solely on his own experience and knowledge, he does not rely on any documents, and that his opinions would not change even if the cited documents in his report were omitted. (**Ex. 8**, Sargent Depo in *Johnson,* at 27; *see also* ECF 210, Memo in Supp. MPSJ; ECF 216, Memo Mot. Limit Sargent).

16.     Regarding Paragraphs 25 through 27, Plaintiffs do not dispute that RADM Sargent's Report states the matters contained in these paragraphs; however, Sargent testified, that he relies solely on his own experience and knowledge, as set forth above. (Ex. 8, Sargent Depo in *Johnson,* at 27; *see also* ECF 210, Plaintiffs' Memo in Supp. MPSJ; ECF 216, Memo Mot. Limit Sargent). Sargent further admits that he did not have any experience using or writing the gasket specifications while he was in the Navy and that "the procurement of stuff of the Navy from industry" was "not what I was doing" in the Navy. (**Ex. 8**, Sargent Depo in *Johnson* at 238).

Finally, his opinions are contradicted by MIL-STD-129, which required suppliers to include warnings in accordance with the FHSA and MCA L-1 Guide on "package units" of products to be ultimately issued to users of, and he admits that a package unit of sheet gasket material was what was "being issued to people who will use them; correct? A. Yes, sir. . . . Q. . . . It's to the actual person who's going to be using it; correct? A. Yeah. Yes, sir. Uh-huh." (**Ex. 8**, Sargent Depo in *Johnson,* at 166-67).

17.     Regarding Paragraph 28 and the first portion of Paragraph 29, Plaintiffs do not dispute that Sargent states this in his report but challenge the basis for Sargent's opinions in this regard because Sargent admits he relies solely on his own experience, and admitted he has no experience writing, using, or construing the gasket specifications at issue. (*See* ECF 210, Plaintiffs' Memo in Supp. MPSJ; ECF 216, Memo Mot. Limit Sargent). Plaintiffs also demonstrate that, while Sargent speculates that JCI would not have been permitted to include any warnings beyond those specifically required by the Navy, asbestos warnings were required by DOD through MIL-STD-129 by virtue of its incorporation of the FHSA and MCA L-1 Guide. JCI has no witness to contest the construction given to these documents by Plaintiffs' expert, Spear. Regarding the last sentence of Para. 29, Haas stated that the while specifications typically do not focus on what is prohibited—i.e., negative specifications—negative specifications were occasionally used, and he gave at least three examples of negative specifications, including the specification he was addressing at the time—the Navy specification prohibiting asbestos in thermal insulation cement, Amend 1 to MIL-I-2861D (1974). (**Ex. 9**, Additional pages of Haas Depo, 9/16/1980, at 148-151).

18.     Plaintiffs do not dispute Paragraph 30.

19.     Regarding Paragraph 31, Plaintiffs do not dispute that Lowell opines that the specifications state the minimum requirements for labeling products. Lowell relies not only on the

1963 GSA Guide to Specifications and Standards, and the 1963 Navy Guide for specifications, MIL-STD-129, the testimony of Anceravage, Martin, Nelson, and Murad, the minutes of the Navy's 1942 Minimum Requirements for Safety in Contract Shipyards Conference, MIL-STD-1341, Fed. Std. 313, NAVSUP 4500, NAVMAT P-5100, and a number of other documents that are discussed in great detail in his Report. (**Ex. 2**, Lowell Aff. & Report, at 9-20).

20.     Regarding Paragraph 32, Plaintiffs do not dispute that Lowell relies on the definition of "Specifications" contained in the 1963 GSA Guide. JCI admits that the G&P specifications contain provisions relating to labeling but attempts to cut these necessary provisions from the definition of "Specification" in the GSA Guide. JCI further admits that this GSA definition states that specifications are the "minimum requirements for *quality* and construction," and Sargent admitted that the inspection requirements for these markings falls under the "*Quality* Conformance Inspection" provision of these specifications. (**Ex. 6**, Sargent Depo in *Mullinex*, at 66-68). JCI cites to page 3, ¶¶ 5, 7, and 8 to contend that other parts of the GSA Guide deal with markings, but those paragraphs are under the heading, "Benefits Provided by Government Specifications and Standards." That section does not purport to define specifications or guide the labeling of products. (ECF 208-3, Ex. 31 to JCI's MSJ, at 3).

21.     Regarding Paragraph 33, Plaintiffs do not dispute that Lowell did not work for GSA, know anyone who wrote the GSA Guide, and has not talked to anyone at GSA about its meaning. JCI's attorneys claim that Lowell does not point to any document stating that the GSA Manual is used to interpret either Mil-specs or Fed-specs applicable to goods to be used on Navy ships, but the GSA Guide itself states that it is a Guide for contractors seeking to interpret mil-specs and fed-specs, including navy ship specific specifications. (*See* ECF 208-3, Ex. 31 to JCI's MSJ, at ii (Forward); *see also id.* at iii (Table of Contents with sections on mil-specs and fed-

specs); *id.* at 13 (specifically discussing "limited" military specs and listing as an example MIL-T-15294 (Ships), which is a limited specification only applicable to Navy ships). Plaintiffs do not dispute that Lowell refused to guess about what the author of the GSA Guide had in mind.

22.     Regarding Paragraph 34, Plaintiffs do not dispute that Lowell interprets the 1963 Navy Manual to state that specifications state the minimum quality level required for adequate performance. As noted above, marking of gasket material was inspected as part of the *Quality* Conformance inspection set forth in ¶ 4.4 of each of the versions of the specifications at issue in this case. Again, Lowell refused to speculate about "what the author had in mind" and relies on the plain language of the Manual.

23.     Regarding Paragraph 35, Plaintiffs do not dispute the first two sentences. With regard to the third sentence, Haas was asked whether warnings were required on "specifically cloth, yarn, tape, and threads" (ECF 206-20, at 50), or on insulation products (ECF 206-20, at 57). Haas was not asked about gaskets and packing, and he testified that "you have to examine each specification, because each specification has its own packaging requirement," (ECF 206-20, at 50:5-8). Sargent admitted in *Mullinex* that he is not an expert in the various DOD levels of packaging or the packaging requirements of the gasket specifications. (**Ex. 6,** Sargent Depo in *Mullinex*, at 139-140). Haas never purported to be an expert in warnings. (ECF 206-20, at 50:1-3). Finally, Plaintiffs do not dispute that Lowell relied primarily on MIL-STD-129 and MIL-M-15071. Because the equipment defendants have settled or been dismissed, MIL-M-15071, which relates to equipment technical manuals is no longer at issue.

24.     Plaintiffs do not dispute Paragraph 36. Because each of the military and federal G&P specifications incorporated MIL-STD-129, this DOD standard became part of the G&P specifications, and JCI was required to comply with MIL-STD-129 and its incorporated references,

including FHSA and the MCA L-1 Guide. Finally, the representative version of MIL-STD-129 that JCI attached to its brief, MIL-STD-129E (1970), is significantly different from the only version Sargent briefly discussed in his Report, MIL-STD-129D (1960). (ECF 208-2, Ex. 30 to JCI's MSJ, Sargent's Report, at 35-36). Accordingly, Sargent should not be permitted to discuss MIL-STD-129E. On the other hand, Lowell's Report contains a comprehensive discussion of all versions of MIL-STD-129, including MIL-STD-129E. (**Ex. 2**, Lowell Aff. & Report, at 12-18).

25.     Plaintiffs do not dispute the first sentence of Paragraph 37. JCI's own expert, Sargent, disagrees with JCI's spin on Martin's testimony in the second, third and fourth sentences of Paragraph 37. In his report, Sargent states that MIL-STD-129 "is excrutiatingly [sic] detailed and complete in specifying all aspects of marking requirements. Compliance with these requirements is mandatory. Deviations cannot be made without approval and specific instructions from a cognizant military authority." (ECF 208-2, Ex. 30 to JCI's MSJ Brief, at 36). Additionally, Martin was testifying as an inspector on how an inspector uses MIL-STD-129 to guide his inspection; he was not testifying on whether a contractor was required to comply with the provisions of MIL-STD-129. Plaintiffs do not dispute the last two sentences of Paragraph 37.

26.     Plaintiffs do not dispute the first three sentences of Paragraph 38. Though asbestos is not specifically referenced in MIL-STD-129, neither are any hazardous substances, including trichloroethylene, radiation, and hexavalent chromium. MIL-STD-129 does not have to list hazardous substances by name because it incorporates FHSA and the MCA L-1 Guide, which define hazardous substances in terms of their properties—toxic, poisonous, flammable, etc.—and guide manufacturers on formulating warnings for those hazardous substances. (*See* **Ex. 10**, Excerpts of Spears Aff. & Report at 80-85). As Spear opines, asbestos fits within the definition of "toxic" under FHSA and MCA L-1 Guide and, therefore, required a warning. Additionally, MIL-

STD-129E incorporated MIL-STD-1341 and, later, Fed. Std. 313. Both standards put JCI on notice that any product that released dust with a threshold limit value (TLV) less than 25 mppcf during its normal use—like asbestos—met the definition of "hazardous material" and required warnings. Finally, the version of MIL-STD-129 that Lowell was questioned about during his deposition on January 21, 2011 was the base version issued in 1951. (ECF 208-6, Ex. 34, Excerpts of Lowell depo, 1/21/11, at 180). This was an early version that was issued by the Munitions Board Standards Agency. (*Id.* at 182). His unfamiliarity with that version does not foreclose his review and reliance on later version with which he is very familiar.

27.     With regard to Paragraph 39, Plaintiffs do not dispute that Lowell relied on MIL-M-15071 for his opinions regarding "equipment." At the time Lowell provided his Report and Deposition, there were a number of equipment defendants in the case, all of whom have now settled or have been dismissed. Thus, MIL-M-15071 is not at issue anymore. Additionally, Lowell's distinction in his Report between equipment manufacturers, like valve and pump manufacturers, and component manufacturers, like JCI was necessary to account for his opinions regarding all of the defendants, not just JCI.

28.     Plaintiffs do not dispute the statements in Paragraph 40. Lowell references the testimony of JCI's competitors to support his opinion that warnings could be placed on the face of gasket material while the same G&P specifications at issue here were in force. With regard to the last sentence, Lowell is not opining on whether the warnings placed on Garlock's, Anchor's, and Green Tweed's gaskets were *adequate*; only that they were able to do what JCI now claims it could not do.

29.     Regarding Paragraph 41, Lowell *quotes* from a single page of Heffron's 2009 deposition in his Report in which Heffron, testifying as Garlock's corporate representative, states

that Garlock put warnings on the face of *all* of its gasket material beginning in 1977, while HH-P-46E was in force. Lowell also provided JCI with his reliance list and copies of the documents on that list with his Report. (**Ex. 11**, Lowell's Reliance List Index). Item number 61 included "assorted testimony by Garlock MKP (Heffron)." Included within that "assorted testimony" was the transcript of Heffron's testimony in *Davis v. Garlock*, Oct. 28, 2003—a Navy case. In *Davis*, Heffron testified that they put the same warnings on all of their Navy gaskets and packing and that they did not treat the Navy any differently. (**Ex. 12**, Excerpts of Heffron in *Davis*, 10/28/03, at 101). Lowell also included excerpts of Heffron's testimony in *In re: Hawaii Asbestos Cases*, Sept. 12, 2007, a deposition involving exposures at Pearl Harbor Naval Shipyard, in which Heffron again stated that all of Garlock's gaskets bore the warning beginning in 1977.

30.     With regard to Paragraph 42, Plaintiffs do not dispute that Heffron was deposed again in this case. During that deposition, Heffron reaffirmed his testimony from *Davis* and *In re: Hawaii* that, while testifying as corporate representative for Garlock, he stated that Garlock put warnings on the face of all of its gasket material, including its Navy gasket material, beginning in 1977. He confirmed that his testimony in those cases was true and based on his research and understanding as Garlock's corporate representative. While he stated that Garlock's Navy gasket material had an adhesive label with a warning applied directly to the face of the gasket material, as opposed to being "branded" into the material itself, his testimony confirms that contractors were able to put a warning label directly on the face of their gasket material while HH-P-46E was in force. (**Ex. 13**, Heffron Testimony, 9/13/19, at 13-15, 17-28, 34-40, 46-51). Finally, regardless whether he personally recalled seeing a shipment, he was testifying as Garlock's corporate representative in 2003 and 2007 based on the company's knowledge, not his personal knowledge.

31.     Regarding Paragraph 43, Plaintiffs do not dispute the first sentence. Plaintiffs also

do not dispute that Crowther stated he didn't know if the warnings made it to the end users. Again, Lowell is not relying on Crowther's testimony for *adequacy* of warnings; he is relying on it to demonstrate that warnings could be placed on the face of gasket material. Crowther testified that Green Tweed placed warnings on the face of *all* of its gasket material. Plaintiffs dispute the assertion by JCI's attorney that this deposition did not involve Navy exposure claims. The deposition occurred in a large consolidation of over twenty cases in Texas and the short excerpt provided does not apprise Plaintiffs of the allegations or exposure history in each of those cases.

32.    Regarding Paragraph 44, Plaintiffs do not dispute that Lowell relies on the testimony of John Call. Contrary to JCI's assertion, the 1993 testimony that Lowell relies upon establishes that Anchor placed labels on all of their gasket material beginning in the mid-1970s. Like JCI, Anchor rebranded Raybestos-Manhattan gasket material. Pursuant to Anchor's directions, Raybestos-Manhattan applied a warning label to all of Anchor's sheet gasket material prior to shipping it to Anchor so that Anchor would not have to open the packaging to apply the label. (**Ex. 14**, Excerpt of Call Depo, 6/25/93, at 90-93). Finally, the 1992 deposition of Call, which JCI cites in support of its MSJ is consistent with this testimony and, in any case, it is not on Sargent's reliance list or any other JCI witnesses' reliance list.

33.    Plaintiffs Dispute Paragraph 45, Lowell's full statement was:

Q. Is it your opinion that the Navy permitted asbestos warnings or did it require asbestos warnings to accompany gasket and packing products sold to the Navy?

A. I believe warnings would have been required. If somebody knew that a product posed a danger and I have not seen any warning rejection labels, not one, in my travels to the United States archives where the Navy said we do not want to take your advice for a warning relative to asbestos. So that's my story, sir.

Q. Is it your opinion that the Navy permitted a warning on the face of a gasket or is it your opinion that the Navy required a warning on the face of a gasket?

A. I think it's my opinion that it was required and would have been permitted if somebody petitioned the Navy to allow that to go on the face of the gasket.

15

Q. Why would they have to petition the Navy if it was already required?

A. Well, I just know that I felt it was required, but it wasn't there. And then I hear the story, well, the Navy never would have let us do it. But I do not believe that that's the case. I believe the Navy would have allowed that and I see no rejection letters in all of my trips to the archives from the Navy.

(**Ex. 3,** Excerpts of Lowell Depo, Vol. 1 at 166-167 (objections omitted)).

34.    Regarding Paragraph 46, Plaintiffs do not dispute that Lowell abandoned the use of NAVSANDA Pub. No. 9 during his deposition because it is a 1940s era document that was cited primarily with regard to equipment manufacturers who provided equipment and repair parts in the 1940s for some of Johnson's ships. It does not apply to JCI's gaskets and packing that would have been sold to the Navy in the 1960s and 1970s.

35.    Regarding Paragraph 47, Plaintiffs do not dispute that Lowell relies on NAVMAT P-5100, *Safety* Precautions for Shore Activities, (March 1970) and that it applies primarily to Naval shore activities and Navy military and civilian personnel. (**Ex. 15**, Excerpts of NAVMAT P-5100 (Mar. 1970)). Lowell cites this document for its description of the extensive asbestos thermal insulation control procedures that were implemented in Navy shipyards, including Norfolk Naval Shipyard, where Laughlin's ship was overhauled in November 1970, and where Johnson was employed as a pipefitter from 1974 to approximately 1980, to demonstrate that Plaintiffs' exposure to uncontrolled asbestos from thermal insulation work would have been unlikely and to show that none of these procedures address gaskets and packing. (*See id.* at 20-22 to 20-23). He also cites it to demonstrate that these asbestos control procedures were published under the Navy's *Safety* Precautions for Shore Activities, rebutting Sargent's *ipse dixit* opinion that asbestos was not a *safety* issue in the Navy. (*See id.* at cover and 20-22). Finally, he cites the Labeling Chapter for his opinion that the Navy told its own personnel that *product suppliers*, like JCI, were required to provide warnings in accordance with MIL-STD-1341, and that Navy supervisors were required to

transfer those suppliers' warnings if the product was repackaged or unpackaged prior to use. (*Id.* at 20-32, § 2086, ¶2, and §2087, ¶ 3).

36.     Plaintiffs do not dispute the assertion in Paragraph 48 that Lowell also relies on the FHSA (formerly known as FHSLA), Fed. Std. 313, and MIL-STD-1341.

37.     Regarding Paragraph 49, Plaintiffs agree that FHSA is incorporated into MIL-STD-129E (1970) and subsequent versions, and Plaintiffs agree that Lowell did not see FHSA prior to being involved in these cases. Lowell is not being offered as an expert regarding FHSA. Plaintiffs' warning and industrial hygiene expert, Spear, will discuss FHSA. Spear opines that FHSA required warnings on "toxic" substances, including asbestos, and that the 1966 amendments to FHSA required warnings to be placed on the face of the actual product in the form of a label or a tag if it was foreseeable that the product would be unpackaged before reaching the ultimate user. (**Ex. 10**, *Excerpts of* Spear Aff. & Report, at 95). JCI has disclosed no witness to testify about the portions of FHSA that were incorporated by reference into MIL-STD-129. Accordingly, the remainder of Paragraph 49 is the opinion of JCI's attorneys and is not admissible evidence. Therefore, this Court should disregard the balance of the paragraph.

38.     Regarding Paragraph 50, Plaintiffs do not dispute the first two sentences of the paragraph. Though Fed. Std. 313 adopts, in part, the National Fire Protection Association's (NFPA) warning standards, JCI has disclosed no witness to testify about this industry warning standard. Sargent disclaimed any expertise for industry warning standards like the NFPA and MCA L-1 standards during his deposition. (**Ex. 8**, Sargent Depo in *Johnson,* at 29). Accordingly, the statements of JCI's attorneys regarding the NFPA are solely their own opinions and are not competent evidence. Lowell and Spear rely on Fed. Std. 313 and its predecessor MIL-STD-1341 mainly for their congruent definitions of "Hazardous Material" in Appendix B of each standard.

This defines a hazardous material, in part, as a product that, in the course of normal use, releases dust that has a TLV less than 25 mppcf. Spear will opine that asbestos has always had a TLV less than 25 mppcf and, therefore, asbestos products were defined as hazardous materials under both of these standards. Because MIL-STD-1341 and later Fed. Std 313 were incorporated by reference into MIL-STD-129, and since MIL-STD-129 was, likewise, incorporated by reference in to the G&P specifications, this put JCI on notice that their products were "hazardous materials" under DOD and Federal warning standards and that they required warnings and Material Safety Data Sheets (MSDS). Sargent's discussion of these standards in his Report is a single sentence, and JCI's other witnesses do not mentions them at all. (ECF 208-2 Ex. 30, Sargent's Report, at 37).

39.     Plaintiffs do not dispute the assertions in Paragraph 51 for purposes of this motion.

40.     Plaintiffs do not dispute the assertions in Paragraphs 52 through 55 about the Navy's concerns about asbestos and the Navy's efforts to control the hazard they purchased from asbestos thermal insulation manufacturers. Every Navy expert in this case, however, agrees that nobody in the Navy comprehended the hazards of asbestos gaskets until at least 1975 when Beckett tested gaskets at Puget Sound Naval Shipyard (PSNSY) with technology available to JCI for decades and recommended to the Commander of *that* Shipyard that gasket workers be treated as asbestos workers. (**Ex. 16**, 1975 Beckett Memo). This was not a Navy-wide decision; it was a recommendation for PSNSY. JCI's Navy expert, Sargent, agreed that the Navy's concerns up to this point were focused on asbestos thermal insulation, that the hazards of gaskets and packing were "completely off the Navy's radar" and that actual Navy-wide procedures to guard against the hazards of gaskets and packing were not implemented until the latter 1970s or early 1980s. (**Ex. 8**, Sargent Depo, at 110-119). Finally, Plaintiffs cannot comment on JCI's beliefs in the final sentence of Paragraph 55; however, this statement is belied by Springs' prior testimony that JCI

began providing dust masks and local exhaust ventilation for its employees at its gasket cutting table in the 1940s. (**Ex. 18**, Springs Depo in *Daniel v. JCI*, at 33-37).

41.     Regarding Paragraph 56, JCI misquotes Lowell's statement in ¶ 6 of his 20-year old affidavit for GE. In that sentence, Lowell stated: "Warnings to the Navy or its shipbuilder *by GE* concerning the properties of gasket materials would have been superfluous." (ECF 206-16, at ¶ 6 (emphasis added)). JCI leaves out "by GE." GE was not a gasket manufacturer. Lowell was not asked in that affidavit to comment on whether a company, like JCI, that held itself out as a *gasket manufacturer* should have warned or whether its warnings would be superfluous.

### C.   <u>Counterstatement of Material Facts Not in Dispute</u>.

<u>Summary</u>: Plaintiffs' experts, Spear and Lowell, will testify that DOD's MIL-STD-129 incorporated by reference the MCA L-1 Guide and the FHSA. JCI admits that MIL-STD-129 was, in turn, incorporated into the G&P specifications. Sargent agrees that incorporated documents became part of the cover document. Thus, JCI was required to comply with all of these documents when selling gaskets and packing to the government. Spear will testify that both the MCA L-1 Guide and FHSA required JCI to put asbestos hazard warnings on the face of their asbestos gasket material and on the boxes and spools of their valve packing. None of JCI's experts' Reports mentions FHSA. The only JCI expert who mentions the MCA L-1 Guide in his report is Sargent, but he admitted that he does not hold himself out as an expert in industry warnings standards. Accordingly, Spear's opinions regarding the MCA L-1 Guide and FHSA, as incorporated by reference into MIL-STD-129 and the G&P specifications are uncontested.

1.     Plaintiffs have disclosed Lowell to testify, *inter alia,* about DOD's MIL-STD-129 and other military specifications and standards. (**Ex. 2**, Lowell Affidavit & Report).

2.     Plaintiffs have disclosed Spear to testify, *inter alia*, about the MCA L-1 Guide and

FHSA. (**Ex. 10**, Excerpts of Spear Affidavit & Report, at 80-85). Spear is an expert in the interpretation of federal and industry warnings standards and requirements and uses them to teach industrial hygiene students about warning principles. (**Ex. 17**, Spear Deposition in *Johnson*, at 174). He discusses MIL-STD-129, the MCA L-1 Guide, and FHSA extensively in his report. (**Ex. 10,** Spear Aff. & Report, at 80-85, 94-95).

3.    JCI identified six experts in these cases: two navy experts, McCloskey and Sargent; an industrial hygiene expert, Ringo; a state-of-the-art expert, Sicilia; and two medical experts, Crapo and Beasley. McCloskey's report never mentions FHSA or the MCA L-1 Guide. (ECF 210-7, McCloskey Report). Ringo's Report never mentions MIL-STD-129, MCA L-1 Guide, FHSA, or any other military or industry warning standard. (*See* ECF 210-9, Ringo report). Crapo, Beasley, and Sicilia also do not mention any of these warning standards in their reports. (ECF 210-11, Crapo Report; ECF 210-12, Beasley Report; ECF 210-13, Sicilia Report).

4.    Sargent is the only JCI expert who briefly discusses MIL-STD-129 and the MCA L-1 Guide in his report. (ECF 208-2, Ex. 30 to JCI's MSJ, Sargent Report, at 35-37). Sargent does not mention FHSA in his report, and he does not discuss either FHSA or the MCA L-1 Guide in his rebuttal report. (*Id.*; **Ex. 19**, Sargent Rebuttal in *Johnson*).

5.    Sargent's report specifically discusses MIL-STD-129C (1960), which was revised twice before Plaintiffs' respective exposures began. His report also addresses only the 1946 version of the MCA L-1 Guide, which was revised at least six times before Plaintiffs' respective exposure periods began. (ECF 208-2, Ex. 30 to JCI's MSJ, Sargent Report, at 36).

6.    Sargent admitted that he does not hold himself out as an expert with regard to industry warning standards like the MCA L-1 Guide or NFPA. (**Ex. 8**, Sargent Depo in *Johnson*, at 29). In *Mullinex v. JCI*, also pending in this Court, Sargent admitted that he has no experience

interpreting FHSA. (**Ex. 6**, Sargent Depo in *Mullinex,* at 125). Accordingly, JCI has disclosed no expert qualified to contest Spear's opinions regarding the requirements of the MCA L-1 Guide and FHSA, as incorporated by reference into MIL-STD-129.

7.      According to Spear, the MCA L-1 Guide is an industry standard for when and how to formulate precautionary warning labels for hazardous substances. (**Ex. 10**, Spear Aff. & Report, at 73-74,76, 80, 83).

8.      DOD started publishing MIL-STD-129 in the early 1950s. It was mandatory for use by the Departments of the Army, Navy, and Air Force. (**Ex. 2**, Lowell Aff. & Report, at 12). Sargent agrees that DOD published MIL-STD-129 and the standard is mandatory for all DOD agencies. (**Ex. 6**, Sargent Depo in *Mullinex*, at 122).

9.      When another publication is incorporated by reference into a specification or standard, it becomes part of that specification or standard. (**Ex. 5**, Lowell Depo in *Johnson*, Vol. II at 154-155). Sargent agrees that "it means that the other standard is essentially part of the cover standard." (**Ex. 8**, Sargent Depo in *Johnson*, at 140-141).

10.     MIL-STD-129 provides "the requirements for the uniform marking of military supplies and equipment for shipment and storage." (**Ex. 5**, Lowell Depo in *Johnson,* Vol. II at 153-54). Sargent agrees that this is the scope of the standard, and he further agrees that "the scope of this standard doesn't have anything to do with household goods; correct? . . . A. It wouldn't appear to." (**Ex. 6**, Sargent Depo in *Mullinex*, at 123).

11.     DOD incorporated the MCA L-1 Guide into MIL-STD-129D, which governed until 1970. MIL-STD-129D provides:

> 5.2.2.4 *Hazardous Chemicals*. All <u>package units</u> of hazardous chemicals <u>to be ultimately issued to the consumer who may be exposed to such chemicals under conditions of ordinary use</u> shall have affixed thereto such warning labels <u>as may be required in accordance with the Manufacturing Chemists Association's Manual L-1</u>, A Guide for

Preparation of Warning Labels for Hazardous Chemicals or in accordance with appropriate Department of Defense instructions as published which shall take precedence.

(**Ex. 2**, Lowell Aff. & Report, at 13 (emphasis added); **Ex. 10**, Spear Aff. & Report, at 82-83).

12.     Spear discusses "Public Law 86-613, better known as the Federal Hazardous Substances Labeling Act that was enacted by Congress on July 12, 1960." (**Ex. 10**, Spear Aff. & Report, at 80). FHSA defines the term "hazardous substance" as:

1. (A) Any substance or mixture of substances, which is "toxic" ... if such substance or mixture of substances may cause substantial personal injury or substantial illness during or as a proximate result of any customary or reasonably foreseeable handling or use ....

(**Ex. 10**, Spear Aff. & Report, at 80-81).

13.     FHSA defines "toxic" substance as "any substance which has the capacity to produce personal injury or illness to man, through ingestion, inhalation, or absorption ..." The term "label" is defined as:

a display or written, printed, or graphic matter upon the immediate container of any substance: and a requirement made by or under authority of this Act that any word, statement, or other information appear on the label shall not be considered to be complied with unless such word, statement, or other information also appears ( 1) on the outside of container or wrapper, if any there be, unless it is easily legible through the outside container or wrapper, and (2) on all accompanying literature where there are directions for use, written or otherwise ...

(**Ex. 10,** Spear Aff. & Report, at 81).

14.     The 1961 version of the MCA L-1 Guide "published a year after the Federal Hazardous Substances Labeling Act was enacted, adopts verbatim the definition of dust, hazardous substance and toxic substance previously defined in the Federal Hazardous Substances Labeling Act." (**Ex. 10,** Spear Aff. & Report, at 82). This version "also provides that 'the text as presented in this guide should be used in addition to or in combination with any specific wording required by law ... such laws include the Federal Hazardous Substances Labeling Act.'" (**Ex. 10**, Spear Aff. & Report, at 82).

15.     In 1966, Congress enacted "public law 89-756, which amends the Federal Hazardous Substances Labeling Act." (**Ex. 10**, Spear Aff. & Report, at 83). This amendment dropped the word "Labeling" from the Act's title and redefined the term "label" as follows:

> The term label means a display of written, printed, or graphic matter upon the immediate container of any substance **or, in the case of an article which is unpackaged or is not packaged in an immediate container intended or suitable to deliver to the ultimate consumer, <u>a display of such matter directly upon the article involved or upon a tag or other suitable material affixed thereto</u>**.

(**Ex. 10**, Spear Aff. & Report, at 83 (emphasis added)).

16.     "By 1966, the 1961 MCA L-1 Guide, which was incorporated by reference in MIL-STD-129D (1964), was already telling manufacturers of asbestos sheet gasket material to provide warning labels in accordance with the definitions of the Federal Hazardous Substances Act." (**Ex. 10**, Spear Aff. & Report, at 83).

17.     Naval Supply Systems Command promulgated MIL-STD-1341(SA) in 1969. This standard required material safety data sheets (MSDS) and warning labels for any "hazardous material" supplied to the Navy. Appendix B defines a "Hazardous Material" as a material that "(b) Has a threshold limit value below ... 25 mppcf for dust . . . or (g) in the course of normal operations may produce dusts ... which have one or more of the above characteristics." At this time, asbestos had a TLV of 5 mppcf; consequently, products that release asbestos dust "in the course of normal operations" were "hazardous material[s]" requiring MSDS sheets and warning labels. (**Ex. 10**, Spear Aff. & Report, at 84).

18.     DOD adopted MIL-STD-1341 in 1970. It "was now 'mandatory for use by all Departments and Agencies of the Department of Defense.'" It retained the same definition of "hazardous material." (**Ex. 10**, Spear Aff. & Report, at 84).

19.     Version E of MIL-STD-129 (1970) incorporated the MCA L-1 Guide, MIL-STD-1341, and FHSA and required warnings in accordance with these standards:

5.2.2.5 Hazardous chemicals and materials. All unit and intermediate packages of hazardous chemicals and materials (including aerosol propellants) <u>shall have affixed thereto the applicable warning label prescribed by MIL-STD-1341</u> (Symbols For Packages and Containers For Hazardous Industrial Chemicals and Materials), <u>the Manufacturing Chemists Association Manual L-1, Guide to Precautionary Labeling of Hazardous Chemicals,</u> and by DoD instructions and military specifications and other standards as published.

5.2.2.5.1 Hazardous substances. All <u>package units</u> of hazardous substances (<u>as defined by Public Law 86-613, Federal Hazardous Substances Act) to be ultimately issued to the consumer</u> shall have affixed thereto such warning labels <u>as may be required by Public Law 86-613 and amendments or changes thereto</u>.

(**Ex. 20**, Excerpts of MIL-STD-129E, at 19; **Ex. 2**, Lowell Aff. & Report, at 13; **Ex. 10,** Spear Aff. & Report, at 84).

20.     MIL-STD-129D and E define "package units" to include a "sheet" and a "roll" and it is the unit of the product that is issued to a consumer, like a machinist mate or pipefitter, who ultimately uses it. (**Ex. 10**, Spear Aff. & Report, at 80, 82-85, 95; **Ex. 5,** Lowell Depo in *Johnson*, Vol. II at 157-162). JCI's sheet gasket material came in sheets and rolls. (**Ex. 8**, Sargent Depo in *Johnson*, at 158-159; **Ex. 1**, *Springs Test. in Halsema v. JCI,* 4/4/06, at 90).

21.     Sargent agreed that typically the package unit that a machinist mate or pipefitter a receives is "a piece of the material . . . as opposed to a larger quantity." (**Ex. 8**, Sargent Depo in *Johnson*, at 160). Sargent agreed that it was what was "being issued to people who will use them; correct? A. Yes, sir. . . . Q. . . . It's to the actual person who's going to be using it; correct? A. Yeah. Yes, sir. Uh-huh." (**Ex. 8**, Sargent Depo in *Johnson,* at 166-67).

22.     In sum, "[f]rom 1957 to at least 1976, every version [of MIL-STD-129] incorporated the MCA L-1 warning Guide. From 1960 to at least 1976 every version indirectly incorporated the FHSA's warning provisions. From 1970 to at least 1976 every version directly incorporated the FHSA and its warning provisions." (**Ex. 2**, Lowell Aff. & Report, at 14-15).

23.     Spear concludes as follows:

24

> By virtue of this incorporation of FHSA and its 1966 amendment, John Crane, Inc. was required by DOD regulation and Federal law to include warnings directly on the sheet gasket material if it was "unpackaged or is not packaged in an immediate container intended or suitable for delivery to the ultimate consumer."

(**Ex. 10**, Spear Aff. & Report, at 84).

24.     MIL-STD-129 "transcends the Navy, it includes the Navy, but it includes everybody in the Department of Defense. Q. So the Navy would have to abide by this standard; correct? A. Yes, sir." (**Ex. 5**, Excerpts of Lowell Depo, Vol. II at 152-53). Sargent agrees that MIL-STD-129 "is excrutiatingly [sic] detailed and complete in specifying all aspects of marking requirements. Compliance with these requirements is mandatory. Deviations cannot be made without approval and specific instructions from a cognizant military authority." (ECF 208-2, Ex. 30 to JCI's MSJ, Sargent Report, at 36).

25.     JCI has disclosed no witness to dispute Spear's opinions regarding the meaning and effect of the MCA L-1 Guide or FHSA, which were incorporated into MIL-STD-129. JCI admits that MIL-STD-129 was, in turn, incorporated into the G&P specifications.

26.     In addition to the documents discussed above in Paragraph 19 of Section B, Responses to JCI's Statement of Undisputed Facts, Lowell's opinion that specifications state the minimum marking requirements is also supported by the 1966 Armed Services Procurement Regulations (ASPR), (*see* **Ex. 21**, 32 CFR § 1.1201(a), ASPR (1966) (noting that "specifications . . . shall state only the actual minimum requirements of the Government"), a 1968 Memorandum from the Assistant Secretary of Defense (**Ex. 22**, 1968 Memo, at 1 ("Current policy prescribes that the quality of items to be procured be specified or described in terms of minimum requirements."), and the 1966 version of the GSA Guide (**Ex. 23,** 1966 GSA Guide, at 1 (same definition of "Specification" as in the 1963 Guide).

27.     JCI admitted in the *Mullinex* case in 2017 that the Navy "never expressly rejected, prohibited or forbade you from including any warning ***with or on any product*** that you sold or supplied to the U.S. Navy, Department of Defense, or United States Government." (**Ex. 24**, JCI's Responses to Requests for Admissions in *Mullinex v. JCI*, at 53-54, RFA 7; *see also id.* at 50-56, RFAs 4-11). Springs verified these responses—to include the RFAs. (*Id.* at Verification Page).

## ARGUMENT

To prove the affirmative government contractor defense, JCI must prove by a preponderance of the evidence that (1) the United States approved reasonably precise specifications; (2) the product conformed to those specifications; and (3) the JCI warned the United States about the dangers in the use of the product that were known to JCI but not to the United States. *Boyle v. Un. Techs. Corp.*, 487 U.S. 500, 512 (1988). The Fourth Circuit refined this test for warning claims: "(1) the government exercised its discretion and approved certain warnings; (2) the contractor provided the warnings required by the government; [and] (3) the contractor warned the government about dangers in the equipment's use that were known to the contractor but not to the government." *Sawyer v. Foster Wheeler*, 860 F.3d 249, 256 (4th Cir. 2017).

Under both tests, the elements are conjunctive, JCI bears the burden of proving them, and the proof must relate to the particular defect at issue. *See Bailey v. McDonnell Douglas Corp.,* 989 F.2d 794, 801 (5th Cir. 1993). Importantly, *Boyle* tethered the government contractor defense to the discretionary function immunity of the Federal Tort Claims Act; it is nothing more than a derivative form of the FTCA discretionary function immunity. Here, the government made a discretionary decision dating back to at least the Minimum Requirements Conference in 1942 to delegate primary responsibility for warnings to product suppliers. (*See, e.g.,* Lowell's Aff. & Report, at 18 (citing 1942 Navy Minimum Requirements Conference (noting that it is a "devil of

26

a job" for the Navy, contract shipyards, and the Maritime commission to analyze each material to determine hazards and it is "very easy for the manufacturer who puts the labels on there to give us that information."). JCI asks this Court to second guess that discretionary decision.

JCI cannot prove the first prong of the government contractor defense. As Spear and Lowell stated in their reports and depositions, the warning standards in the MCA L-1 Guide and FHSA, which were incorporated into MIL-STD-129 and, therefore, into the gasket and packing specifications, required that all "package units" of hazardous substances to be issued to the user must contain the warnings. Additionally, the 1966 amendments to FHSA required that "in the case of an article which is unpackaged or is not packaged in an immediate container intended or suitable to deliver to the ultimate consumer," the warning must be "directly upon the article involved or upon a tag or other suitable material affixed thereto." (**Ex. 10**, Spear Aff. & Report, at 100). Sargent admits that the ultimate user was typically issued a piece of unpackaged sheet gasket material.

JCI has disclosed no expert to address the FHSA. Sargent mentioned the MCA L-1 Guide, but admitted he is not an expert in industrial warning standards like this Guide. No other JCI witness mentions the MCA L-1 Guide. So, Spear's opinions regarding the MCA L-1 Guide and FHSA, are uncontested. In fact, JCI does not mention Spear once in its MSJ.

The only JCI witness who attempts to construe the gasket specifications, Sargent, relies solely on his own experience. But he admits that he never had any experience with the gasket specifications while he was in the Navy. His *ipse dixit* opinion that the specifications dictate the exclusive markings on the face of the gasket material is contradicted not only by Lowell, but by (1) the 1963 and 1966 GSA Guides, (2) the 1966 ASPR regulations, (3) the 1968 Assistant Secretary of Defense memo, (4) the consistent pre-2018 admissions of JCI's corporate representatives, (5) the exemplars of JCI Navy gasket material that contained additional markings

27

that were not part of JCI's brand identification, and (6) the testimony of JCI's gasket competitors that they started putting warnings on the face of their gasket material in the 1970s while these specifications controlled. Indeed, Sargent's opinion is even contradicted by JCI's admissions less than two years ago that the Navy "never expressly rejected, prohibited or forbade you from including any warning with or on any product that [it] sold or supplied to the U.S. Navy, Department of Defense, or United States Government." (**Ex. 24**, JCI's Responses to RFAs). Moreover, Sargent never explains why the Navy was permitted to ignore the clear "excrutiatingly [sic] detailed and complete" requirements of MIL-STD-129 when he admits that "[c]ompliance with these requirements is mandatory."

*Boyle* based its rationale on whether a tort requirement conflicts with a significant federal interest. *Boyle*, 487 U.S. at 508-512. "Stripped to its essentials, the military contractor's defense under *Boyle* is to claim, '[t]he Government made me do it.'" *In re Joint E. & S. Dist. N.Y. Asb. Litig.*, 897 F.2d 626, 632 (2d Cir. 1990). "*Boyle* displaces state law only when the Government, making a discretionary, safety-related military procurement decision contrary to the requirements of state law, incorporates this decision into a military contractor's contractual obligations, thereby limiting the contractor's ability to accommodate safety in a different fashion." *Id.*

As Spear's uncontested opinions demonstrate, JCI was required by the MCA L-1 Guide and FHSA, which Sargent admits became part of MIL-STD-129 and the G&P specifications, to put warnings on its products, including the face of its gasket material. Spear states that these provisions told JCI to put warnings on the "package units" of JCI's asbestos products—the package units that Lowell and Sargent agreed were issued the users of the products—Laughlin and Johnson.[2] Thus, not only did the government issue reasonably precise specifications telling JCI to

---

[2] A number of courts have granted plaintiffs' motions for summary judgment on this defense. *See,*

warn, but those specifications were precisely in sync with the tort law duty to warn.

Under the second prong, JCI was required to conform to the government's specifications. JCI concedes that it never warned at all until after Plaintiffs' exposures ended. Thus, JCI concedes it did not comply with reasonably precise specifications telling them to warn, and cannot prove the second prong.

JCI cannot prove the third prong because JCI's own expert admits that the dangers in the use of asbestos gaskets and packing were completely off the Navy's radar during the relevant period. Sargent agrees that the first potential documentation showing that anyone in the Navy started to appreciate the dangers in the use of asbestos gaskets and packing was not until 1975 and all prior Navy asbestos control efforts were focused on thermal insulation. Significantly, the third prong of *Boyle* requires proof that "the supplier warned the United States about the dangers ***in the use of the equipment*** that were known to the supplier but not to the United States." *Boyle*, 487 U.S. 500, 512 (1988); *accord Sawyer*, 860 F.3d at 256. Contrary to JCI's position, this prong does not relate to general hazards, it relates to product-specific dangers "in the use of" JCI's product.

"In cases involving products alleged to be defective due to inadequate warnings, 'the manufacturer is held to the knowledge and skill of an expert. . . . The manufacturer's status as expert means that at a minimum he must keep abreast of scientific knowledge, discoveries, and advances and is presumed to know what is imparted thereby.'" *Foster v. Am. Home Prod. Corp.*, 29 F.3d 165, 169–70 (4th Cir.1994) (quoting *Borel v. Fibreboard Paper Prods. Corp.,* 493 F.2d

---

*e.g., Trevino v. Gen. Dyn. Corp.*, 865 F.2d 1474, 1487-88 (5th Cir. 1989); *McCormick v. C.E. Thurston & Sons, Inc.*, 977 F. Supp. 400, 403 (E.D. Va. 1997); *Dorse v. Armstrong World Indus., Inc.*, 716 F. Supp. 589, 592 (S.D. Fla. 1989) *aff'd sub nom. Dorse v. Eagle-Picher Indus., Inc.*, 898 F.2d 1487 (11th Cir. 1990). JCI's reliance on the decision in *Mullinex v. JCI,* 4:18-cv-33 is misplaced. Magistrate Judge Krask was making a plausibility finding at the removal stage; he was not ruling on a summary judgment motion in view of the evidence adduced in the case.

1076, 1098 (5th Cir.1973)). This expert status "is relevant in determining (1) whether the manufacturer knew or should have known the danger, and (2) whether the manufacturer was negligent in failing to communicate this superior knowledge to the user or consumer of its product." *Borel*, 493 F.2d at 1089. JCI was the manufacturer[3] and is held to the status of an expert with regard to dangers in the use of its products. The Navy was the consumer and is not held to that standard. Because it is uncontested that the Navy was not aware of the dangers in the use of JCI's products, and because it is uncontested that JCI did not warn the Navy of those dangers, JCI cannot prove the third element as a matter of law.

## CONCLUSION

JCI has no evidence to prove any of the three elements of the government contractor defense. Spear's opinions are not only uncontested by any JCI expert, but completely unaddressed by JCI's MSJ. Accordingly, it is uncontested that the U.S. approved reasonably precise specifications telling contractors to warn. JCI admits it never warned of the hazards of its products until at least the 1980s and, thus, JCI cannot prove as a matter of law that its products conformed to those specifications. Finally, every Navy expert in this case, from both sides, admits that the dangers in the use of gaskets and packing were completely off the Navy's radar; yet JCI admits it still failed to warn the Navy about the dangers in the use of the product that were known to JCI but not to the Navy under the third prong. Accordingly, this Court should deny JCI's MSJ and grant Plaintiffs' MPSJ on the Government Contractor and Sophisticated Purchaser Defense.

---

[3] JCI manufactured the asbestos-containing packing that it supplied to the Navy. JCI "rebranded" the asbestos sheet gasket material with its own name and symbol number and sold it to the Navy as though it was its own product. "One who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer." Restatement (Second) of Torts § 400; *see also Foster*, 29 F.3d at 169–70.

Respectfully Submitted,

By:  /s/ William W.C. Harty
*Counsel for Plaintiffs*

William W.C. Harty, Esq. (VSB # 45447)
Robert R. Hatten, Esq. (VSB # 12854)
Hugh B. McCormick, III, Esq. (VSB # 37513)
Erin E. Jewell, Esq. (VSB # 71082)
Samantha P. Graham, Esq. (VSB# 93529)
PATTEN, WORNOM, HATTEN & DIAMONSTEIN, L.C.
12350 Jefferson Avenue - Suite 300
Newport News, VA 23602
(757) 223-4500 Telephone
(757) 249-3242 Facsimile
Pleadings@pwhd.com
wharty@pwhd.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 5th day of December, 2019, I electronically filed Plaintiffs' Opposition to John Crane, Inc.'s Motion for Summary Judgment with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

| | |
|---|---|
| Jeffrey S. Poretz, Esq.<br>Carl Schwertz, Esq.<br>**MILES & STOCKBRIDGE PC**<br>1751 Pinnacle Drive, Suite 1500<br>Tysons Corner, VA 22102-3833 | Counsel for BW/IP International, Inc. (f/k/a Byron Jackson Pump Division) Individually and as successor-in-interest to Byron Jackson Pumps *in Johnson*<br><br>Counsel for Gardner Denver, Inc. *in Johnson*<br><br>Counsel for Spirax Sarco, Inc. *in Laughlin* |
| David Bowen, Esq.<br>Brianna L. Barnes, Esq.<br>WILLCOX & SAVAGE, P.C.<br>Wells Fargo Center<br>440 Monticello Avenue, Suite 2200<br>Norfolk, VA 23510 | Counsel for Aurora Pump Co. *in Johnson and Laughlin* |
| Steven A. Luxton, Esq.<br>Jonathan E. Maier, Esq.<br>Christian Kozlowski, Esq.<br>MORGAN LEWIS & BOCKIUS LLP<br>1111 Pennsylvania Avenue NW<br>Washington, DC 200004-2541 | Counsel for Goulds Pumps, LLC *in Johnson*<br><br>Counsel for Grinnell LLC *in Johnson*<br><br>Counsel for ITT LLC f/k/a Hammel-Dahl Company, f/k/a General Controls Co. *in Johnson* |
| David B. Oakley, Esq.<br>Albert H. Poole, Esq.<br>POOLE BROOKE PLUMLEE PC<br>4705 Columbus Street, Suite 100<br>Virginia Beach, VA 23462 | Counsel for The William Powell Company *in Johnson* |
| Lynn K. Brugh, IV<br>WILLIAMS MULLEN<br>Williams Mullen Center<br>200 South 10th Street, Suite 1600<br>Richmond, VA 23219 | Counsel for Flowserve US Inc., Individually and as successor in interest to Rockwell Edwards Valves *in Johnson and Laughlin* |

| | |
|---|---|
| Timothy S. Brunick, Esq.<br>Marilyn Harvey, Esq.<br>CLARKE DOLPH HULL & BRUNICK, PLC<br>5712 Cleveland Street, Suite 130<br>Virginia Beach, VA 23462 | Counsel for IMO Industries, Inc. as successor in interest to DeLaval Pumps *in Johnson and Laughlin*<br><br>Counsel for Warren Pumps, LLC *in Johnson and Laughlin* |
| William W. Nexsen, Esq.<br>James D. Turrietta, Esq.<br>STACKHOUSE NEXSEN & TURRIETTA PLLC<br>4505 Colley Avenue<br>Norfolk, VA 23508<br><br>James G. Kennedy, Esq. (*pro hac vice*)<br>Mark T. Rainsford, Esq. (*pro hac vice*)<br>PIERCE, SLOAN, WILSON, KENNEDY & EARLY LLC<br>321 East Bay Street<br>Charleston, SC 29401 | Counsel for Union Carbide Corporation a subsidiary of The Dow Chemical Company *in Johnson and Laughlin* |
| Christopher J. Wiemken, Esq.<br>TAYLOR WALKER, P.C.<br>1206 Laskin Road, Suite 100<br>Virginia Beach, VA  23451 | Counsel for Crane Co.*in Johnson and Laughlin* |
| Shawn A. Voyles, Esq.<br>Scott C. Hartin, Esq.<br>Paul R. Schmeding, Esq.<br>MCKENRY DANCIGERS DAWSON, PC<br>192 Ballard Court, Suite 400<br>Virginia Beach, VA 23462 | Counsel for Waco, Inc.*in Johnson and Laughlin* |
| Malcom S. Brisker, Esq.<br>GOODELL, DeVRIES, LEECH & DANN, LLP<br>One South Street, 20th Floor<br>Baltimore, MD 21202 | Counsel for Viking Pump, Inc.*in Johnson* |

| | |
|---|---|
| Eric G. Reeves, Esq.<br>Brian J. Schneider, Esq.<br>Mary Louise Roberts<br>Lisa Moran McMurdo<br>**MORAN REEVES & CONN PC**<br>1211 East Cary Street<br>Richmond, VA 23219<br><br>Bradley A. Hays, Esq. (*pro hac vice*)<br>**MANNING GROSS & MASSENBURG LLP**<br>1700 S. 28th Ave, Ste. D<br>Hattiesburg, MS 39402<br><br>Christopher O. Massenburg, Esq. (*pro hac vice*)<br>Jeanette S. Riggins, Esq. (*pro hac vice*)<br>**MANNING GROSS & MASSENBURG LLP**<br>One Canal Place<br>365 Canal Street, Ste. 3000<br>New Orleans, LA 70130<br><br>Rebecca C. Kibbe, Esq. (*pro hac vice*)<br>**MANNING GROSS & MASSENBURG LLP**<br>600 Brickell Ave., Ste. 1400<br>Miami, FL 33131 | Counsel for Armstrong International, Inc. Individually and as successor to Armstrong Machine Works *in Laughlin*<br><br>Counsel for John Crane, Inc. *in Johnson and Laughlin*<br><br>Counsel for Nash Engineering Company *in Johnson and Laughlin*<br><br>*Pro Hac Vice* Counsel for John Crane, Inc. *in Johnson and Laughlin* |

| | |
|---|---|
| Stephen R. Jackson, Esq.<br>**LAW OFFICES OF STEPHEN R. JACKSON, PLLC**<br>100 Bank Street<br>Suffolk, VA 23434<br><br>David C. Marshall, Esq. (*pro hac vice*)<br>Peter R. York, Esq. (*pro hac vice*)<br>Eric T. Hawkins, Esq. (*pro hac vice*)<br>**HAWKINS PARNELL & YOUNG, LLP**<br>303 Peachtree St., N.E. Ste. 4000<br>Atlanta, GA 30308<br><br>Peter D. Polchinski, Esq (*pro hac vice*)<br>**HAWKINS PARNELL & YOUNG, LLP**<br>600 Lexington Ave., 8th Floor<br>New York, NY 10022 | Counsel for Milwaukee Valve Company *in Laughlin* |

Respectfully Submitted,

By:  /s/ William W.C. Harty
*Counsel for Plaintiffs*