**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division**

**ANDREA E. JOHNSON, et al.,**

**PLAINTIFFS,**

**v.**

**Case No. 4:18-cv-132-RAJ-LRL**

**AIR & LIQUID SYSTEMS CORPORATION**
*Successor by Merger to Buffalo Pump, Inc., et al.*

**DEFENDANTS.**

**PLAINTIFFS' OPPOSITION TO JOHN CRANE INC.'S
MOTION *IN LIMINE* TO EXCLUDE PLAINTIFFS' EVIDENCE
OF NONPECUNIARY AND SURVIVAL DAMAGES**

JCI contends that, under the U.S. Supreme Court's decision in *Dutra Group v. Batterton*, 139 S. Ct. 2275 (2019), Magistrate Judge Miller's findings in his Report and Recommendation ("R&R")[1] to this Court in the similarly situated matter of *Mullinex v. JCI* (Case No. 4:17cv33),[2] and the MDL decision in *Boesenhofer v. Aecom, et al.*, No. 2:17-CV-01072 (E.D. Pa. June 22, 2021), Plaintiffs are not entitled to pre-death pain and suffering and medical expenses of Mr. Laughlin, loss of society, or punitive damages in this case. However, maritime survival claims and pre-death pain and suffering damages are fully recognized under maritime law, as demonstrated in JCI's thoroughly cited case, *Miles v. Apex Marine Corp.*, 498 U.S. 19 (1990). Further, the analysis set forth in *Atlantic Sounding v. Townsend*, 557 U.S. 404, 414 (2009) and approved and

---

[1] In *Mullinex*, Plaintiffs respectfully objected to Magistrate Judge Miller's findings in the R&R as to loss of society, but Judge Jackson has not ruled on those objections yet.
[2] Pre-death pain and suffering, medical expenses of a deceased seaman, and the merits of a maritime survival action were not involved in JCI's motion in *Mullinex* and are matters that have yet to be fully considered by this Court.

used in *Batterton* would approve both punitive damages and loss of society in third-party general maritime cases like this one.

First, in *Miles*, the U.S. Supreme Court clearly stated that, in addition to wrongful death damages, a seaman's estate may recover survival damages for the seaman's pre-death pain and suffering, as provided by the Jones Act, which adopts § 59 of the Federal Employer's Liability Act. While the *Miles* Court limited the *wrongful death* damages available to the seaman's beneficiaries to pecuniary losses, it expressly affirmed an award *survival* damages of $140,000 to a seaman's estate for his pre-death pain and suffering. *Miles*, 498 U.S. at 22-23. And according to JCI and *Boesenhofer*, *Miles* is dispositive. (See ECF 362, at 9; ECF 362-2, at 4; ECF 362-3, at 3).

Next, under *Atlantic Sounding v. Townsend* and *Norfolk Shipbuilding & Drydock Corp. v. Garris*, 532 U.S. 811 (2001), both punitive damages (*Atlantic Sounding)* and negligence (*Garris*) were well established in general maritime law long before Congress entered the maritime fray and enacted the Death on the High Seas Act ("DOHSA") and the Jones Act in 1920.

Likewise, loss of society in both injury and death cases also satisfies the analysis set forth in *Atlantic Sounding*, 557 U.S. at 414, because loss of society was approved in general maritime cases long before 1920. *Batterton* determined that punitive damages are not available in a very circumscribed area of maritime law—an unseaworthiness claim brought by a Jones Act seaman against his employer for injuries in the scope of his employment. But the same analysis that the Court applied in *Batterton* leads to the inexorable conclusion that both loss of society and punitive damages are available in a general maritime negligence action against a third party.

## **BACKGROUND & RELEVANT FACTS**

I.      **Background of Relevant Maritime Law.**

Until 1920, the maritime tort law relevant here was almost exclusively judge made law—or "general maritime law." There were no maritime statutes specifically governing recovery in these types of maritime torts. And the only statute that directly impacted maritime tort claims, at all, was the maritime jurisdictional statute, 28 U.S.C. § 1333.

The "savings to suitors" clause of §1333 saves to maritime suitors all common law remedies that the common law is competent to give—including disparate state damages for injury and death, with two primary effects. First, it established concurrent jurisdiction over maritime claims in both federal and state courts. Second, it enabled courts hearing maritime claims to supplement those claims with non-conflicting state legal principles and remedies. *See Leon v. Galceran*, 78 U.S. 185, 188 (1870) (construing the "savings to suitors" clause to mean "when the suit is *in personam* . . . the mariner may proceed by libel in the District Court, or he may, at his election, proceed in an action at law either in the Circuit Court, if he and his debtor are citizens of different States, or in a State court"); *Am. Steamboat Co. v. Chase*, 83 U.S. 522, 534 (1872) (holding that "Congress intended by that provision [the "savings to suitors" clause] to allow the party to seek redress in the admiralty if he saw fit to do so, but not to make it compulsory in any case where the common law is competent to give him a remedy" and ruling that admiralty may enforce Rhode Island's state wrongful death and survival statutes); *Ballard Shipping Co. v. Beach Shellfish*, 32 F.3d 623, 626 (1st Cir. 1994) ("The upshot is that an injured party may have claims arising from a single accident both under federal maritime law and under state law, whether legislation or common law" and "[s]tate remedies under the savings to suitors clause may be pursued in state court or, where there is a basis for federal jurisdiction, in federal court" even in a case directly implicating a core admiralty concern). Pursuant to this clause, for over 150 years—including the 100 years since DOHSA and the Jones Act were enacted in 1920—the US Supreme

Court has repeatedly approved maritime application of state death statutes (along with varying state nonpecuniary damages) in third party negligence cases like this one.

Apart from the impact of §1333, it is important to distinguish between claims that existed before 1920 and claims that came into being in 1920 or later. This is because the two primary statutes that may affect maritime employment and tort law were enacted in 1920—the Jones Act and the Death on the High Seas Act (DOHSA). Proper application of the *Atlantic Sounding* analysis, as reiterated and applied in *Batterton*, requires determining whether the claim at issue came into being before or after 1920. As the Court stated in *Batterton*, in *Atlantic Sounding* "we recognized the importance of viewing each claim in its proper historical context. '"[R]emedies for negligence, unseaworthiness, and maintenance and cure have different origins and may on occasion call for application of slightly different principles and procedures."'" *Batterton*, 139 S. Ct. at 2283 (quoting *Atlantic Sounding,* 557 U.S. at 423).

**A.  Relevant Pre-1920 Maritime Law.**

**1.  Maritime Negligence and Unseaworthiness Claims.**

Before 1920, personal injury negligence actions against third-party defendants[3] were well established in general maritime law. *See, e.g., Leathers v. Blessing*, 105 U.S. 626 (1881) (third-party negligence action by cotton broker against master of a vessel that was carrying the plaintiff's cotton); *The Max Morris v. Curry*, 137 U.S. 1, 2 (1890) (holding that contributory negligence is not a bar to recovery in a maritime third-party negligence action); *see also Garris,* 532 U.S. at 813-817 (discussing the history of general maritime negligence actions and the interplay between third-

---

[3] The Supreme Court defines a maritime third-party claim as a claim against a defendant that "neither employed" the plaintiff "nor owned the vessel" on which the plaintiff was injured or killed. *Garris*, 532 U.S. at 819 (noting that the plaintiff was not barred by the LHWCA compensation bar because the defendant "is a third party: It neither employed respondent's son nor owned the vessel on which he was killed").

party negligence actions and various federal statutes including DOHSA, the Jones Act, and the Longshore & Harbor Workers Compensation Act (LHWCA)). It was for these reasons that Justice Scalia, writing for the Court in *Garris*, observed in 2001 that "[t]he general maritime law has recognized the tort of negligence for more than a century," long before the enactment of the Jones Act or DOHSA. *Garris,* 532 U.S. at 820.

In contrast to third party actions, which have existed under general maritime law for at least 150 years, negligence actions by seamen against their employers were traditionally unavailable. In fact, in *The Osceola*, the United States Supreme Court specifically held that "the seaman is not allowed to recover an indemnity for the negligence of the master, or any member of the crew," and, therefore, they were relegated to the age old maintenance and cure claim and an unseaworthiness claim that is unrecognizable to the claim that exists today. *The Osceola*, 189 U.S. 158, 177 (1903).

At the time, unseaworthiness was essentially a general maritime breach of implied warranty claim tied to the shipping articles (an employment contract) entered into between the seaman and the employer, owner, or operator of the ship. By entering into that contract, the ship owner impliedly warranted that the ship would be "seaworthy." *See, e.g., The Lizzie Frank*, 31 F. 477, 480 (S.D. Ala. 1887); *see also* Schoenbaum, Admiralty and Maritime Law, Vol. 1, §6:24, at 556 (6th ed. 2018). But this unseaworthiness claim was not a strict liability claim at the time. *Id.* (noting that "[w]hile the owner, then, is bound to provide a seaworthy ship, he is not an insurer or warrantor of the seaman against latent and undiscoverable defects in the vessel."). Because unseaworthiness claims are tied to the employment contract, they generally have been limited to actions by seamen against the vessel, vessel owner, or employer—third parties cannot claim the benefits of this employment warranty and Laughlin and his estate were precluded by the *Feres* doctrine from

seeking recovery from the United States.

### 2. Maritime Death Claims.

Death claims were one of the different rules—apart from English common law—that maritime law adopted in the 1800s. Prior to 1886, maritime courts routinely held that survivors could recover a remedy, or indemnity, for the death of a loved one. *See, e.g., The Sea Gull*, 21 F. Cas. at 910 (holding that a husband may recover for the loss of society and services of his wife in a death action under maritime law); *Cutting v. Seabury*, 6 F. Cas. 1083, 1084 (D. Mass. 1860) (noting that a father could recover in a death action "damages for the loss of his [son's] society, and of the opportunity of directing his education and training," but dismissing the case on other grounds); *James v. Christy*, 18 Mo. 162, 164 (1853) (holding in a maritime case that a parent is normally entitled to bring a death claim for the "remuneration for the loss of society or comforts afforded by a child to his parent," but that, because the deceased child's parent died during the pendency of the suit, the parent's administrator was not entitled to loss of society).

In 1886, however, the Supreme Court departed from the prior consistent opinions ruling that there was a death claim under general maritime law and held that maritime law does not recognize a death claim. *See The Harrisburg*, 119 U.S. 199, 213, (1886). After this decision, plaintiffs were relegated to seeking death remedies under state law—pursuant to the "savings to suitors" clause of §1333—if the death occurred in the territorial waters of a coastwise state. If the death occurred on the high seas—defined at the time as more than three nautical miles from the shores of the United States—there was no remedy. Thus the Court's ruling in *The Harrisburg*—a decision that the Court has since overruled as "dubious even when rendered"—created a gaping hole in the available maritime remedies for the death of a person.

Maritime courts attempted to ameliorate the harsh consequences of *The Harrisburg* by

using state wrongful death and survival statutes in maritime cases.  In fact, the application of these

state death statutes, which were beginning to be enacted by states in the late 1800s and early 1900s

was directly approved by the Supreme Court in 1907—even though it had only twenty years earlier

held that there was no death remedy in maritime cases. *See The Hamilton*, 207 U.S. 398, 404

(1907) (approving state death remedies in admiralty case based on the "saving to suitors" clause

which grants, "in all cases, the right of a common-law remedy where the common law is competent

to give it" and therefore "leaves open the common-law jurisdiction of the state courts [and federal

courts sitting in diversity] over torts committed at sea"). This became the approved method of

recovering for the death of a loved one in third-party maritime cases until at least 1970, and it still

persists today. *See Hess v. U.S.,* 361 U.S. 314, 320 (1960) ("Even *Southern Pacific Co. v. Jensen*,

which fathered the 'uniformity' concept, recognized that uniformity is not offended by 'the right

given to recover in death cases"); *Ex parte McNiel*, 80 U.S. 236, 243 (1871)("A State law may

give a substantial right of such a character that where there is no impediment arising from the

residence of the parties, the right may be enforced in the proper Federal tribunal whether it be a

court of equity, of admiralty, or of common law."). In sum, there still was no death claim for a

seaman employee against his employer, but third-party death claims could be brought under in

maritime under state death acts.

### 3.  Loss of Society.

Similarly, before 1920, maritime courts also routinely recognized and upheld the recovery

of loss of society damages. *See, e.g., The Sea Gull*, 21 F. Cas. at 910; *Cutting*, 6 F. Cas. at 1084;

*James*, 18 Mo. at 164. In a third party negligence case in the then-Territory of Washington, the

court first held that federal maritime law applied and governed the issues in the case, and then

proceeded to discuss issues revolving around whether a wife could maintain an action by herself

without her husband under paternalistic common law concepts. During the discussion the court

noted that if a wife "was damaged by the wrongful act of a third party, two actions lay, one by the

husband along for his losses, *per quod consortium amisit*, and for expenses of cure, etc., another

by herself and husband for what she personally had suffered." *Phelps v. The City of Panama*, 1

Wash. Terr. 518, 533 (1877), *aff'd sub nom. The City of Panama*, 101 U.S. 453 (1879).

Ultimately, the court determined that the verdict awarded was too low given the gravity of

the injuries involved and increased the verdict by a factor of three. The U.S. Supreme Court

affirmed, stating:

> When the suit is brought by the party for personal injuries, there cannot be any fixed
> measure of compensation for the pain and anguish of body and mind, nor for the permanent
> injury to health and constitution, but the result must be left to turn mainly upon the good
> sense and deliberate judgment of the tribunal assigned by law to ascertain what is a just
> compensation for the injuries inflicted.

*The City of Panama*, 101 U.S. 453, 464 (1879). While it is not clear from the decision whether

some of the damages were actually awarded for loss of consortium, it is absolutely clear that loss

of consortium was considered not just a type of damage, but a separate legal claim—an action *per

quod consortium amisit*—that was available for personal injuries to a spouse in a maritime case.

Likewise, a federal court in Louisiana awarded loss of society damages to the wives of three sailors

who lost their lives as a result of a ship collision. *The E B Ward, Jr*, 23 F. 900, 902 (C.C.E.D. La.

1885). The court found that one of the ships, The E.B. Ward, Jr., was negligent in failing to change

her course or failing to reverse her engines, and the court held that each of the surviving wives was

"entitled to recover under the general admiralty law for the loss of the society and support of their

deceased relatives, and for the personal effects." *Id.*

In sum, claims for loss of society were well recognized prior to 1920.

**B.  The 1920 Enactment of the Jones Act and DOHSA.**

In 1920, Congress enacted two statutes to fill the gaps created by the Court's rulings in *The Osceola* and the *Harrisburg*. Congress enacted the Jones Act to statutorily overrule *The Osceola* and provide a negligence claim for seamen to bring *against their employers* for injuries or death *in the course of their employment*. *See* 46 U.S.C. § 30104 ("*A seaman* injured *in the course of employment* or, if the seaman dies from the injury, the personal representative of the seaman may elect to bring a civil action at law, with the right of trial by jury, *against the employer.*").

The Jones Act adopted, *in toto*, the Federal Employers Liability Act ("FELA"). This negligence action is different from the historic maritime third-party negligence actions in at least four respects. First, it is only available to Jones Act seamen. Second, it is only available for injury or death in the course of the seaman's employment. Third, it is only available against the seaman's employer. And fourth, it functions as a hybrid workers compensation claim with a very reduced "featherweight" causation requirement. *See CSX Transp., Inc. v. McBride*, 564 U.S. 685, 705 (2011) (noting in a FELA case, which governs Jones Act cases, proximate cause is not an element, and the employee need only prove that the employer's negligence "played a part—no matter how small—in bringing about the injury.").

Next, Congress enacted DOHSA to create a maritime remedy for deaths that occur on the high seas and fill the gap in death remedies created by the Court's decision in *The Harrisburg*. This action only applies to deaths that occur on the high seas more than three nautical miles from the shores of the United States.

### C.  Maritime Law from 1920 to 1970.

Importantly, though these statutes were passed within days of each other, they "are 'hopelessly inconsistent with each other.'" *Am. Exp. Lines, Inc. v. Alvez*, 446 U.S. 274, 283 (1980) (quoting G. Gilmore & C. Black, The Law of Admiralty 359, 360-367 (2d ed. 1975)).  The Jones

Act provides for both a wrongful death action and a survival action that may be pursued concurrently without election between the two; DOHSA provides only a survival action. The Jones Act has a reduced causation standard; DOHSA has a normal proximate cause standard. The Jones Act applies on both territorial waters and on the high seas; DOHSA only applies on the high seas. The Jones Act applies only to employee negligence actions against employers for scope of employment injuries or death; DOHSA may apply to any deaths on the high seas, but does not impact the death remedies of the Jones Act. And while both the Jones Act wrongful death claim and DOSHA claim were construed by the Court to allow only pecuniary damages, the Jones Act survival claim explicitly allows recovery for non-pecuniary damages including pre-death pain and suffering.

Because of these inconsistencies, it is impossible to find uniformity between these two statutes. This is nowhere more apparent than in the difference between the Court's treatment of employment related claims (Jones Act and unseaworthiness) and non-employment related third-party claims, as in this case. For this reason, when considering a maritime opinion, it is very important to identify whether it involves Jones Act or unseaworthiness claim against an employer, or whether it involves a third-party claim unrelated to the employment relationship.

With the enactment of the Jones Act in 1920, seamen had two primary remedies against their employers for job related injuries or death—unseaworthiness and Jones Act negligence. Again, these were solely available to seamen against their employers for injuries or death arising in the course of their employment. Because of the nature of shipping operations, the term "employer" is broadly characterized as the employer, ship operator, "vessel," and ship owner. This is because ships are typically chartered, or leased, for use by others. Depending on the arrangement, the ship owner may employ the crew, or the chartering ship operator may employ

the crew. See 2 Schoenbaum, Admiralty & Maritime Law § 11:1 Charter party forms and functions, at 3 (6th ed. 2018).

"A Jones Act lawsuit may be properly filed only against the seaman's employer," and "subject matter jurisdiction does not exist if the defendant is not the seaman's employer." *Id.* at Vol. 1, § 6:23, The Jones Act defendant, at 548.  On the other hand, a ship may be unseaworthy as a result of the owner's failure to maintain a safe, seaworthy vessel, or because of hiring reckless, untrained, or dangerous co-employees, or because of unsafe stowage of cargo.  Because of this, seamen pursuing Jones Act and unseaworthiness claims frequently name the owner, operator, employers, shipping agents, and others to ensure they join the right defendant in the case. *See, e.g., Miles*, 498 U.S. at 21 (noting that the plaintiff sued "Apex Marine Corporation and Westchester Marine Shipping Company, the vessel's operators, Archon Marine Company, the charterer, and Aeron Marine Company, the *Archon*'s owner").

Finally, after 1920, seamen suing their employers for scope of employment injuries or deaths were *prohibited* from supplementing their claims with state damages or death remedies. *See Lindgren v. United States*, 281 U.S. 38, 47 (1930) (holding that the Jones Act "covers the entire field of liability for injuries to seamen [against their employers], it is paramount and exclusive, and supersedes the operation of all state statutes dealing with that subject.").

In contrast to the two claims available for a seaman against his employer, tort claims involving third-party defendants could still be filed in state or federal court, on the law or admiralty side, and incorporate solely maritime law or supplement maritime law with state law and principles under the savings to suitor's clause of 28 U.S.C. §1333.

In fact, only a year after the Jones Act and DOSHA were enacted in 1920, the Court decided *Western Fuel Co. v. Garcia,* 257 U.S. 233, 242 (1921), which involved the estate of a longshore

worker suing a stevedore.[4] The Court held:

> As the logical result of prior decisions we think it follows that where death upon such [state territorial] waters follows from a maritime tort committed on navigable waters within a state whose statutes give a right of action on account of death by wrongful act, the admiralty courts will entertain a libel in personam for the damages sustained by those to whom such right is given. The subject is maritime and local in character and the specified modification of or supplement to the rule applied in admiralty courts when following the common law, will not work material prejudice to the characteristic features of the general maritime law, nor interfere with the proper harmony and uniformity of that law in its international and interstate relations.

*W. Fuel Co.*, 257 U.S. at 242.

Twenty years after the enactment of these statutes, the Court decided *Just v. Chambers,* 312 U.S. 383, 392 (1941). *Just* involved a third-party negligence action for personal injuries from carbon monoxide poisoning *passengers* aboard defendant's vessel. The defendant died, and the plaintiffs moved to apply the Florida survival statute, which permitted claims to survive the deaths of both plaintiffs and defendants. In concluding that the Florida survival statute could be used to supplement maritime law, the Supreme Court surveyed cases involving death claims under state law and the "savings to suitors" clause of §1333 going back to 1872 with *Am. Steamboat Co. v. Chase*. 83 U.S. 522, 534 (1872). *See Just*, 312 U.S. at 388, 392; *see also Hess v. United States*, 361 U.S. 314, 320 (1960) (a third-party negligence action against the United States noting that "uniformity is not offended by 'the right given to recover in death cases").

So even after *The Harrisburg* held there was no general maritime death remedy, and even after the Jones Act was enacted with its particular employment related remedies, the Supreme Court still repeatedly held that maritime third party claims could be supplemented by inconsistent state death remedies and that those disparate remedies "will not work material prejudice to the characteristic features of the general maritime law nor interfere with the proper harmony and

---

[4] This case predated the enactment of the Longshore & Harbor Workers Compensation Act (LHWCA) in 1927.

uniformity of that law . . . ." *W. Fuel Co.,* 257 U.S. at 242.

### D.  Maritime Law Since 1970.

In 1970, the Court expressly overruled *The Harrisburg* in *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 378 (1970). In *Moragne,* the Court stated that *The Harrisburg* was "dubious even when rendered," and "such an unjustifiable anomaly in the present maritime law that it should no longer be followed." Since the Court had repeatedly approved the application of disparate state causes of action and damages for third party claims for the 50 years between the passage of DOHSA and the Jones Act in 1920 and the decision in *Moragne* in 1970, litigants questioned whether *Moragne* somehow changed the equation.

The Court directly answered this question for third-party claims in *Yamaha v. Calhoun* in 1996.  In *Yamaha,* the defendant made precisely the argument that JCI makes here:

> Yamaha argues that *Moragne*—despite its focus on "maritime duties" owed to maritime workers—covers the waters, creating a uniform federal maritime remedy for all deaths occurring in state territorial waters, and ousting all previously available state remedies. In Yamaha's view, state remedies can no longer supplement general maritime law (as they routinely did before *Moragne*), because *Moragne* launched a solitary federal scheme.

*Yamaha v. Calhoun,* 516 U.S. 199, 209-210 (1996).  The Court flatly rejected Yamaha's argument:

> The uniformity concerns that prompted us to overrule *The Harrisburg,* however, were of a different order than those invoked by [the defendant]. ***Moragne* did not reexamine the soundness of *The Harrisburg* out of concern that state monetary awards in maritime wrongful-death cases were excessive, or that variations in the remedies afforded by the States threatened to interfere with the harmonious operation of maritime law. <u>Variations of this sort had long been deemed compatible with federal maritime interests</u>.**

*Id.* at 213-24 (emphasis added); *see also Atl. Sounding Co., Inc.,* 557 U.S. at 424 ("The laudable quest for uniformity in admiralty does not require the narrowing of available damages to the lowest common denominator approved by Congress for distinct causes of action.").  *Yamaha* cited, with approval, the decisions in *Just v. Chambers, Western Fuel v. Garcia,* and *Steamboat v. Chase,* noting that "prior to *Moragne,* federal admiralty courts routinely applied state wrongful-death and

survival statutes in maritime accident cases." *Yamaha,* 516 U.S. at 211 & n. 7. Thus the Court "preserve[d] the application of state statutes to deaths within territorial waters" in third-party negligence cases. *Id.* at 216.

The opinions in *Miles* and *Batterton* involved **seamen** suing their "**employers**" for Jones Act negligence and unseaworthiness. There was no remedy available to a seaman for employer negligence prior to 1920 because of the Court's decision in *The Osceola.* Rather that remedy was created by Congress in 1920 in the Jones Act. For this reason, since 1920 the Court has considered itself bound by the Jones Act to maintain uniformity with Congress' expressed delineation of ***that employment related claim.*** And, because unseaworthiness is, likewise, a seaman's claim against an employer, the Court seeks to maintain uniformity in this employment related area, whether the action is directly under the Jones Act, or under the general maritime doctrine of unseaworthiness.

Part of the reason that the Court binds the unseaworthiness remedies to the Jones Act's remedies is that, although unseaworthiness existed before the enactment of the Jones Act, it was not considered a strict liability cause of action until 1946, twenty years after the Jones Act was enacted. *See Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 94–95 (1946)("[Unseaworthiness] is essentially a species of liability without fault"). Once it became a strict liability action, it eclipsed the Jones Act and disrupted the settled expectations of employers and employees in employment related suits. It also created a anomalies in employment related actions. For instance, "in territorial waters, general maritime law allowed a remedy for unseaworthiness resulting in injury, but not for death." *Miles,* 498 U.S. at 26. "Second, DOHSA allowed a remedy for death resulting from unseaworthiness on the high seas, but general maritime law did not allow such recovery for a similar death in territorial waters." *Id.* Finally, "in those States whose statutes allowed a claim for

wrongful death resulting from unseaworthiness, recovery was available for the death of a longshoreman due to unseaworthiness, but not for the death of a Jones Act seaman." *Id.*[5]

In short, if a claim existed *before* the Jones Act, then the Court asks whether anything in the Jones Act directly affects or impairs that claim. This is no different than the common law doctrine that statutes in derogation of existing common law must be strictly construed when determining whether the statute affects that existing common law doctrine. This is essentially the *Atlantic Sounding* test that was applied in *Batterton.*

## ARGUMENT AND ANALYSIS

First, maritime law has long recognized survival actions. As the Supreme Court acknowledged even in *Miles*, a seaman's estate may recover pain and suffering damages pursuant to the Federal Employees Liability Act ("FELA"), 45 U.S.C. § 59, which was expressly adopted by the Jones Act, 46 U.S.C. § 30104.

Next, under the *Atlantic Sounding* test, the Court has established a three-part test to determine what damages are available under discrete maritime causes of action.  First, was the cause of action available in maritime before 1920, when Congress entered the fray with the Jones Act and DOHSA. Second, were the damages sought through this claim available in maritime law prior to 1920. And finally, has Congress enacted legislation departing from the preexisting rule for these claims. *See Atl. Sounding Co., Inc.*, 557 U.S. at 414 (2009).

In *Batterton,* the Court employed a similar test, but changed it in a few regards. As stated

---

[5] This is because of the second portion of the holding in *Sieracki* that a longshore worker who was performing seaman's duties on a ship may also bring an unseaworthiness claim. These so-called *Sieracki* seamen were not otherwise covered by the Jones Act. This holding was statutorily overruled by the 1972 amendments to the LHWCA, which preserved a longshore worker's third-party negligence remedy against a shipowner for injuries suffered on the ship under 33 U.S.C. § 905(b), but abolished the strict liability unseaworthiness claim for longshore workers.

in *Batterton,* the Court considered (i) whether punitive damages had been traditionally awarded *for the claims at issue in that case*, (ii) whether conformity with parallel statutory schemes would require such damages, and (iii) whether the Court was compelled on policy grounds to allow punitive damages for unseaworthiness claims. In *Batterton,* punitive damages were not available *because Batterton* involved a Jones Act suit against an employer, and the Jones Act (a) did not exist before 1920 and (b) does not include punitive damages on its face.

Under either analysis, punitive damages and loss of society are available in this case. But since JCI relies primarily on *Batterton,* Plaintiffs will analyze the issue under those elements. The answer to the first question under Batterton is split into two parts: (A) punitive damages were traditionally available for *third party negligence* claims under maritime law, and (B) both loss of society damages and loss of society claims were traditionally available in maritime law. Regarding the second *Batterton* question, there are no current or past statutory schemes that require, or deny, such damages in cases involving non-employer third parties.

## I.     Survival Actions and Corresponding Damages have long been Recognized under Maritime Law.

JCI maintains in its brief that survival claims and corresponding damages, such as Mr. Laughlin's pre-death pain and suffering and medical expenses have never been recognized under general maritime law. However, JCI lost this very argument before the Virginia Supreme Court in a prior case with Plaintiffs' counsel. (*See* Exhibit 1, Decision upon Rehearing to Reinstate Survival Damages by Justice Donald W. Lemons (S.C.VA, Sept. 14, 2012). As in this case, JCI attempted to argue that *Miles* precludes all nonpecuniary damages, including pre-death pain and suffering. However, while the *Miles* Court limited seamen's *wrongful death* damages to pecuniary losses under the Jones Act, it also recognized that the Act grants a statutory *survival* action and upheld the decedent's pre-death pain and suffering damages of $140,000. *Miles*, 498 U.S. 22-23.

Unlike DOHSA, Congress expressly provided a survival action for a seaman's pre-death pain and suffering in the Jones Act by adopting FELA. (See 46 U.S.C. § 30104 (The Jones Act); 45 U.S.C. §§ 51, 59 (FELA).[6] When Congress originally enacted FELA in 1908, it contained only a § 51 wrongful death action for the beneficiaries' pecuniary loss. But in 1910, Congress amended FELA to provide add § 59—a survival action for the decedent's loss and suffering.

In 1915, the U.S. Supreme Court analyzed FELA's survival action in *St. Louis, Iron Mt. & S. Rwy* Co. *v. Craft*, 237 U.S. 648 (1915). The Court held:

> (1)    FELA's § 59 survival action allows recovery of a seaman's pre- death pain and suffering;
>
> (2)    No election is required - an estate may pursue <u>both</u> FELA's § 51 wrongful death action and FELA's § 59 survival action, and
>
> (3)    Damages under FELA's § 51 wrongful death action and FELA's §59 survival action do not constitute a double recovery.

*Id.* at 657-61. According to the Court:

> [W]hen this provision [the § 59 survival action] and § 1 [the § 51 wrongful death action] are read together the conclusion is unavoidable that the personal representative is to recover on behalf of the designated beneficiaries, not only such damages as will compensate them for their own pecuniary loss, but also <u>such damages as will be reasonably compensatory for the loss and suffering of the injured person while he lived.</u> Although originating in the same wrongful act or neglect, the two claims are quite distinct, no part of either being embraced by the other.

Id. at 658 (emphasis added).

When Congress enacted the Jones Act, it contained no substantive provisions; instead, it adopted FELA *in toto,* including its§ 59 survival action. By adopting FELA, cases construing

---

[6] The Jones Act, which statutorily provides for pre-death pain and suffering, and DOHSA, which does not provide for pre-death pain and suffering, are in direct conflict. DOHSA, however, does not preempt the survival damages of seamen. See C*alhoun v. Yamaha Motor Corp., U.S.A.,* 40 F.3d 622, 637 (3d Cir.1994), *aff'd,* 516 U.S. 199, 216 (1996).  Accordingly, DOHSA can have no impact on the survival damages the Estate may recover in this case.

this statutory survival right, including *Craft,* became directly binding on claims by the estates of seamen. In fact, the Court recognized *Craft's* direct application to maritime law, and in particular seamen, in 1937. *See Van Beeck v. Sabine Towing* Co., 300 U.S. 342, 346-47 (1937) (quoting *Craft,* 237 U.S. at 658) (finding that the survival action "continues any cause of action belonging to the decedent, without abrogating or diminishing the then existing [wrongful death] cause of action for the use of his survivors.").

Since 1920, the U.S. Supreme Court and the ten U.S. Circuit Courts of Appeal that have considered the issue have enforced the statutory right to recover damages for pre-death pain and suffering.[7] Moreover, many Federal Circuit Court that have considered the issue have recognized survival of pre-death pain and suffering in general maritime cases.[8] This is because no statute

---

[7] *See Craft,* 237 U.S. at 658; *see also Miles,* 498 U.S. at 35 (citing *Craft* and affirming a $140,000 pre-death pain and suffering award); *Van Beeck,* 300 U.S. at 346-47; *Cape Fear, Inc. v. Martin,* 312 F.3d 496 (1st Cir. 2002), *affirming In re Cape Fear, Inc.,* 183 F. Supp. 2d 228, 284 (D. Mass. 2001) (Jones Act damages include "conscious pain and suffering of decedents"); *Calhoun v. Yamaha Motor Corp., U.S.A.,* 40 F.3d 622, 638 (3d Cir. 1994), *aff'd* 516 U.S. 199 (1996)(noting that "[u]nlike DOHSA, the Jones Act does provide for a survival action" for "losses suffered during the decedent's lifetime"); *Self v. Great Lakes Dredge* & *Dock* Co., 832 F.2d 1540, 1549 (11th Cir. 1987) (the Jones Act provides "damages award for conscious pain and suffering"); *Cook v. Ross Island Sand&. Gravel* Co., 626 F.2d 746, 748 (9th Cir. 1980)( approving Jones Act pre-death pain and suffering); *Deal v. A.P. Bell Fish* Co., 728 F.2d 717, 718 (5th Cir.1984) (approving Jones Act pre-death pain and suffering); *Spiller v. Thomas M. Lowe, Jr.* & *Associates, Inc.,* 466 F.2d 903, 909 (8th Cir. 1972) (noting the Jones Act allows pre-death pain and suffering); *Grantham v. Quinn Menhaden Fisheries, Inc.,* 344 F.2d 590, 593 (4th Cir. 1965) (affirming Jones Act pre- death pain and suffering); *Cleveland Tankers, Inc. v. Tierney,* 169 F.2d 622, 626 (6th Cir. 1948) (citing *Craft* and noting right to pre-death pain and suffering); *The Black Gull,* 82 F.2d 758, 760 (2d Cir. N.Y. 1936) (noting an estate may recover "such damages as will be compensatory for the conscious pain and suffering of the injured employee while he lived"); *Leathern Smith-Putnam Navigation* Co. *v. Osby,* 79 F.2d 280 (7th Cir.1935), *affirming The Material Service,* 11 F. Supp. 1006, 1013 (D. Ill. 1934) (awarding Jones Act pre-death pain and suffering).

[8] *Wahlstrom v. Kawasaki Heavy Indus., Ltd.,* 4 F.3d 1084 (2nd Cir. 1993); *Evich v. Connelly,* 759 F.2d 1432, 1434 (9th Cir. 1985); *Kuntz v. Windjammer Barefoot Cruises,* 573 F. Supp. 1277, 1284 (W.D. Pa. 1983), *aff'd,* 738 F.2d 426 (3d Cir. 1984); *Law v. Sea Drilling Corp.,* 523 F.2d

prohibits the survival of these damages, it is consistent with the Jones Act, and it serves the longstanding maritime policy that "it better becomes the humane and liberal character of proceedings in admiralty to give than to withhold the remedy ...." *Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 387 (1970) (quoting Chief Justice Chase *in The Sea Gull,* 21 F. Cas. 909, 910 (C.C. Md. 1865)). Finally, all of the major maritime treatises note that pre-death pain and suffering is provided for seamen by statute.[9]

*Miles* (upon which JCI relies) upheld this well-known statutory right. Section V of *Miles* repeatedly recognized that estates have a statutory right to pursue "losses suffered during the decedent's lifetime," and it cited directly to § 59 and *Craft.* As a result, *Miles* upheld the estate's pre-death pain and suffering award of $140,000.

JCI cites to the recent MDL decisions in *Boesenhofer* as its saving grace as to why pre-death pain and suffering should not be permitted in this maritime case involving a deceased seaman. (*See* ECF Nos. 362-2, 362-3). However, neither of these decisions support JCI's argument that survival claims, and corresponding damages, are prohibited under maritime law. These decisions note that a defendant argued that the plaintiff could not recover survival remedies or wrongful death nonpecuniary damages under maritime law. Finding *Miles* to be dispositive, the court held only that summary judgment was granted for the plaintiff's nonpecuniary and/or

---

793, 795 (5th Cir. 1975); *Barbe v. Drummond,* 507 F.2d 794, 799-800 (1st Cir. 1974); *Spiller,* 466 F.2d at 909; *Greene v. Vantage Steamship Corp.,* 466 F.2d 159, 166 & n.9 (4th Cir. 1972).

[9] *See, e.g.,* 1 Schoenbaum, Admiralty and Maritime Law 678, § 8-4 (5th ed. 2011) (seamen's estates may recover "[c]onscious pain and suffering of the decedent before death"); 2 Hall & Sann, Benedict on Admiralty 7-87, § 84c (7th ed. 1990) ("The Jones Act, which incorporates by reference [FELA] and adopts its case law as precedent, includes survival rights; thus the decedent's cause of action for pain and suffering does not abate upon his death."); 1 Force & Norris, The Law Of Maritime Personal Injuries 12-42 to 12-43, § 12:8 (5th ed. 2004) (noting Congress and *Miles* approve pre- death pain and suffering for seamen's estates).

punitive damages but did not really address survival damages, such pre-death pain and suffering and medical expenses. (*See* ECF 362-2 at 4-5; ECF 362-3, at 3-4). This is likely because the MDL court in *Boesenhofer*, finding *Miles* to be dispositive, recognized that survival damages were awarded and upheld in *Miles*. Even so, the Eastern District of Pennsylvania cannot overrule *Miles*.

Accordingly, there is no legal basis for this Court to discriminate between the damages a Jones Act seaman's estate may recover and the damages Mr. Laughlin's Estate may recover. *Miles* upheld a $140,000 pain and suffering award; this Court, therefore, should deny JCI's motion and permit recovery for Mr. Laughlin's pre-death pain and suffering and medical expenses.

## II.    Maritime law has Traditionally Recognized that Punitive Damages are Available in Cases Involving Non-Employer Third Parties.

### A.  Punitive Damages and Loss of Society were Traditionally Available in Cases Involving Non-Employer Third Parties Long before 1920.

The next question is whether punitive damages and damages for loss of society were traditionally available in maritime law for the claims in this case. Mr. Laughlin was a "seaman." *See John Crane, Inc. v. Hardick*, 732 S.E.2d 1, 4 (Va. 2012). But the lawsuit of his estate is not against his employer. As pertinent here, the estate's lawsuit contains a general maritime survival claim for negligence against a third-party defendant who supplied products used by Laughlin, and Mrs. Laughlin has a claim for the loss of her husband's society.

As noted above, before 1920, personal injury negligence actions against third-parties were well established in general maritime law. *See, e.g., Leathers v. Blessing*, 105 U.S. 626 (1881); *The Max Morris v. Curry*, 137 U.S. 1, 2 (1890); *see also Garris,* 532 U.S. at 813-817. It was for these reasons that Justice Scalia, writing for the Court in *Norfolk Shipbuilding & Drydock Corp. v. Garris*, observed in 2001 that "[t]he general maritime law has recognized the tort of negligence

for more than a century," long before the enactment of the Jones Act or DOHSA. *Garris,* 532 U.S. at 820. Additionally, as further discussed above, maritime courts also traditionally recognized and upheld the recovery of loss of society. *See, e.g., The Sea Gull*, 21 F. Cas. at 910; *Cutting*, 6 F. Cas. at 1084; *James*, 18 Mo. at 164; *see also Phelps v. The City of Panama*, 1 Wash. Terr. 518, 533 (1877), *aff'd sub nom. The City of Panama*, 101 U.S. 453 (1879); *The E B Ward, Jr*, 23 F. 900, 902 (C.C.E.D. La. 1885). But more than that, in today's age, there can be no policy justification for denying women access to a remedy that men have had access to for almost two centuries.

**B.  The Supreme Court in *Atlantic Sounding* has Already held that Punitive damages were Available in Maritime Law Long Before 1920.**

Next, punitive damages were available in general maritime law before 1920. *Atlantic Sounding* has already answered this question in the affirmative. *Id.* at 412. Surveying maritime decisions from the 1800s, the Court found that

> [P]rior to enactment of the Jones Act in 1920, 'maritime jurisprudence was replete with judicial statements approving punitive damages, especially on behalf of passengers and seamen.' Robertson, Punitive Damages in American Maritime Law, 28 J. Mar. L. & Comm. 73, 115 (1997) (hereinafter Robertson); see also 2 Sedgwick § 599b, at 1156 ("Exemplary damages are awarded in Admiralty, as in other jurisdictions"); 2 J. Sutherland, Law of Damages § 392, p. 1272 (4th ed. 1916) ("As a rule a court of equity will not award [punitive] damages, but courts of admiralty will ..." (footnote omitted)).

*Atl. Sounding Co., Inc.*, 557 U.S. at 412.

Importantly, this finding was not limited to very narrow class of cases, but, rather, the statements of maritime courts in the 1800s demonstrate that punitive damages were generally available to most, if not all, tort actions. For instance, in 1893, the Supreme, the Court stated:

> In this court the doctrine is well settled that **in actions of tort** the jury, in addition to the sum awarded by way of compensation for the plaintiff's injury, may award exemplary, punitive, or vindictive damages, sometimes called 'smart money,' if the defendant has acted wantonly, or oppressively, or with such malice as implies a spirit of mischief or criminal indifference to civil obligations; but such guilty intention on the part of the defendant is required in order to charge him with exemplary or punitive damages.

*Lake Shore & M.S. Ry. Co. v. Prentice*, 147 U.S. 101, 107 (1893) (emphasis added); *see also Fretz v. Bull*, 53 U.S. 466, 467 (1851) (discussing in a collision case that "vindictive damages" ought not be allowed only because there was no negligence, or at best, mutual negligence); *The Golden Gate*, 16 F. Cas. 141, 143 (C.C.N.D. Cal. 1856) (noting in a third-party negligence case that "[i]n an action against the perpetrator of the wrong, the aggrieved party would be entitled to recover not only actual damages but exemplary—such as would vindicate his wrongs, and teach the tortfeasor the necessity of reform."); *The Jane Grey*, 95 F. 693, 697 (D. Wash. 1899) (noting in a third party negligence case that, "[w]hen the death of a person is caused by the wrongful act or negligence of another, his heirs or personal representatives may maintain an action for damages against the person causing the death. . . . In every such action the jury may give such damages, pecuniary or exemplary, as under all the circumstances of the case may to them seem just.").

In *Boston Mfg Co v. Fiske*, 3 F. Cas. 957, 957 (C.C.D. Mass. 1820), Justice Story explained that, in regard to charging costs to a losing defendant, "[c]ourts of admiralty allow such items, not technically as costs, ***but upon the same principles, as they are often allowed damages in cases of torts, by courts of common law, as a recompense for injuries sustained, as exemplary damages***, or as a remuneration for expenses incurred, or losses sustained, by the misconduct of the other party." The Court in *Atlantic Sounding*, in an opinion written by Justice Thomas, understood this to apply generally to punitive damages in tort cases.

Other courts have as well. For instance, in *Stewart v. Cary Lumber Co.*, 59 S.E. 545, 548 (N.C. 1907), the Supreme Court of North Carolina debated the imposition of punitive damages against a corporation for the negligent acts of an employee in a third-party negligence case. That the negligent employee could be subjected to punitive damages was not in question by any of the justices—the only question was whether the company could be vicariously liable for such

damages. In the course of the debate, Justice Brown observes that "'[t]he rule in admiralty as to exemplary damage is the same as in the common-law courts," and cites to *The Amiable Nancy,* and *Boston Mfg. Co. v. Fiske.*

In short, punitive damages were not only available in maritime law before 1920—as already determined by the Court in *Atlantic Sounding*—but punitive damages were known to be applied to third-party negligence cases—the claims at issue here—before 1920.

### C. There are no Parallel Statutory Schemes that Prohibit Punitive Damages or Loss of Society Damages in this Case.

As set forth above, it is important to understand the type of claims at issue when determining whether there is any parallel statutory scheme that guides or restricts the damages in the case. The cases JCI relies upon—primarily *Miles, Batterton, Murray*, 958 F.2d at 132 *Horsley v. Mobil Oil Corp.*, 15 F.3d 200, 203 (1st Cir. 1994); *Lollie v. Brown Marine Serv.*, 995 F.2d 1565, 1565 (11th Cir. 1993), *Smith v. Trinidad Corp.*, 992 F.2d 996, 996 (9th Cir. 1993), and *McBride v. Estis Well Services*, 768 F.3d 382 (5th Cir. 2014) —all dealt with seaman employee claims against their employers and directly invoked the Jones Act and the parallel unseaworthiness claim. Because the Jones Act directly governed an employment negligence claim that did not exist prior to 1920, the Court was required to adhere to that statutory scheme. And because unseaworthiness, though a general maritime claim, has become a parallel source of recovery to the Jones Act negligence claim for seamen in actions against their employers, the Court, likewise, was required to adhere to that parallel statutory scheme. In short, the employer-employee actions at issue in *Miles* and *Batterton* and the other seaman-employer claims were *created* by the Jones Act, and the Court did not want the Congressional scheme established for employee-employer actions to be circumvented by the parallel action of unseaworthiness for the exact same actions against employers for the exact same type of scope of employment injuries.

Importantly, *Batterton* "recognized the importance of viewing each claim in its proper historical context. "'[R]emedies for negligence, unseaworthiness, and maintenance and cure have different origins and may on occasion call for application of slightly different principles and procedures.'" *Batterton*, 139 S. Ct. at 2283 (citing *Atl. Sounding Inc.*, 557 U.S. at 423). And *Miles* recognized that "[t]he legislature does not, of course, merely enact general policies. By the terms of a statute, it also indicates its conception of the sphere within which the policy is to have effect." *Miles*, 498 U.S. at 24. This case involves a unique claim that simply does not involve the unique statutory scheme established for seaman suits against their employers.

Third party negligence actions were not created by the Jones Act and have never been regulated by the Jones Act. The claim at issue in this case preexisted the Jones Act for decades. The claim at issue here does not involve a suit against Laughlin's employer, nor does it have the Jones Act's featherweight causation standard. And, most importantly, while the Supreme Court has held that the Jones Act occupies the entire field of liability for *employment* claims brought by seamen against their employers and that it "supersedes the operation of all state statutes dealing with that subject," *Lindgren*, 281 U.S. at 47,  the Court has repeatedly approved the use of state statutes to supplement maritime remedies in third-party negligence cases from *Am. Steamboat Co. v. Chase*, 83 U.S. 522 (1872), to *W. Fuel Co. v. Garcia*, 257 U.S. 233 (1921), to *Hess v. United States*, 361 U.S. 314 (1960), to *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199 (1996).

Finally, as the Virginia Supreme Court held in *Hardick,* DOHSA does not affect the damages that a seaman may obtain except to the extent that the seaman's estate purposefully invokes DOHSA to sue his or her employer for unseaworthiness under the Act. *See* Exhibit 1.

### D. Policy Grounds Compel This Court To Allow Punitive Damages And Loss Of Society In This Case.

Contrary to JCI's position, DOHSA and the Jones Act do <u>not</u> demonstrate Congress' intent

to bar non-pecuniary damages, and this federal legislation does not dominate all of maritime law. The truth is that Congress has expressed no hostility to nonpecuniary damages.  First, as set forth above the "savings to suitors" clause of the maritime jurisdictional statute, 28 U.S.C. § 1333, expressly permits supplementation of state remedies in maritime third-party negligence cases. This statute, which was passed in 1789, has been consistently construed by the US Supreme Court to allow disparate state and federal remedies in maritime cases.  When Congress enacted the Jones Act and DOHSA almost 150 years after the "savings to suitors" clause was enacted, it was surely aware of the "savings to suitors" clause and the many Supreme Court opinions construing it; yet Congress did not amend the clause or qualify or distinguish it in any way in either the Jones Act or DOHSA.

Secondly, as noted above, the Jones Act and DOHSA are not uniform. When Congress enacted the Jones Act in 1920, it merely incorporated by reference the FELA, *in toto*, which already included a *survival claim* for recovery of the decedent's non-pecuniary pre-death pain and suffering, among other things.  *See* 46 U.S.C. § 30104 (Jones Act); 45 U.S.C. § 59 (FELA survival claim); *see also St. Louis, Iron Mt. & S. Rwy Co. v. Craft*, 237 U.S. 648, 657-61 (1915); *Norfolk & W. Ry. Co. v. Ayers,* 538 U.S. 135, 157 (2003); *Van Beeck v. Sabine Towing Co.*, 300 U.S. 342, 346-47 (1937). Thus, though the Jones Act <u>wrongful death</u> claim allows only pecuniary damages, the Jones Act <u>survival claim</u> allows nonpecuniary damages, including pre-death pain and suffering and emotional distress. Therefore, there is no uniformity of pecuniary damages even within the Jones Act itself, nor is there any between DOHSA and the Jones Act, as noted in Plaintiffs' argument above. Thus, there is no Congressionally mandated uniformity of damages even between these two statutes.

Additionally, in 2000, Congress amended DOHSA by adding a new section, 46 U.S.C.

§ 30307, which allows <u>loss of society</u> damages for certain maritime accidents involving commercial aviation, thus statutorily reversing the U.S. Supreme Court's decisions in *Offshore Logistics v. Tallentire, Zicherman v. Korean Air Lines Co., Mobil Oil Corp. v. Higginbotham.* Indeed, if the incidents at issue in *Offshore Logistics, Zicherman,* and *Mobil Oil Corp.* occurred today, the decedent's survivors would be entitled to loss of society damages under DOHSA itself. *See, e.g., Zicherman v. Korean Air Lines Co.*,516 U.S. 217, 230 (1996); *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 232-33 (1986); *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 619 (1978); *Contrast Brown v. Eurocopter S.A.*, 111 F. Supp. 2d 859, 863 (S.D. Tex. 2000). Thus far from mandating uniformity of damages within DOHSA, Congress has actually introduced dis-uniformity of damages even within DOHSA as late as 2000.

Maritime courts have routinely distinguished JCI's attempt to stretch *Miles* beyond its holding and rationale. *See In re Air Crash Off Long Island, New York, on July 17, 1996*, 209 F.3d 200, 215 (2d Cir. 2000) (Sotomayor, J., dissenting in part) ("The core purpose of DOHSA was to provide a remedy where one did not exist before, not to oust either a *Moragne*-type remedy or state law remedies."); *CEH, Inc. v. F/V Seafarer*, 70 F.3d 694, 702 (1st Cir. 1995) ("[W]e are hesitant to ascribe to the [*Miles*] Court a holding that goes well beyond any issue discussed there."); *Sutton v. Earles*, 26 F.3d 903, 917 (9th Cir. 1994) (noting *Miles'* uniformity language is often misconstrued); *Powers v. Bayliner Marine Corp.*, 855 F.Supp. 199, 201 (W.D. Mich. 1994), *aff'd*, 83 F.3d 789 (6th Cir. 1996), *cert. denied*, 519 U.S. 992 (1996) (proponents of *Miles*-based damages preclusion "paint with a brush too broad"); *Emery v. Rock Island Boatworks, Inc.*, 847 F.Supp. 114, 118 (C.D. Ill. 1994) (same); *In re Cleveland Tankers, Inc.*, 843 F.Supp. 1157, 1158 (E.D. Mich. 1994) (same); *Mussa v. Cleveland Tankers*, 802 F. Supp. 84, 85 (E.D. Mich. 1992) (same); *see also* Robert Force, *The Curse of Miles v. Apex Marine Corp.: The Mischief of Seeking*

*"Uniformity" and "Legislative Intent" in Maritime Personal Injury Cases*, 55 La. L. Rev. 744, 793 (1995). As the First Circuit noted in *CEH, Inc.*, "*Miles,* therefore, does not, as defendants contend, signify a call for universal uniformity of maritime tort remedy, but rather emphasizes the importance of uniformity in the face of applicable legislation" — in that case Jones Act legislation. *CEH, Inc.*, 70 F.3d at 700.

In sum, there is simply no uniformity of damages even between or within Congress' two statutory schemes, and there is no policy reason to advocate overruling 150 years of Supreme Court precedent that has consistently afforded punitive damages and loss of society for traditional third-party negligence actions that do not involve the maritime employer-employee relationship.

### III.   Plaintiffs Adequately Pled Punitive Damages and Gross Negligence Gives Rise to Punitive Damages and Does Not Require Intentional Conduct.

Finally, JCI makes a conclusory argument that Plaintiffs did not adequately plead punitive damages under *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2008), and that Plaintiffs cannot prove the level of negligence required to obtain punitive damages. Plaintiffs pled that JCI negligently or deliberately caused Laughlin's mesothelioma because they "knew, had reason to know, should have known and/or could have reasonably determined that the normal, foreseeable use of their asbestos-containing products posed an unreasonable danger without a warning;" they "knew, had reason to know, or should have known of historic state of the art literature and other information placing them on notice of the hazards of asbestos and products containing asbestos;" they "were able to, and did, obtain liability insurance against the foreseeable asbestos health hazards inherent in the normal foreseeable use of their products; and they "knew, had reason to know, or should have known that the Plaintiff would inhale asbestos dust, fibers and/or particles during or as a consequence of the intended, ordinary and foreseeable use of their asbestos-containing products." Despite this knowledge, Plaintiffs pled

that JCI "mined, manufactured, sold, distributed, and/or otherwise placed in the stream of commerce asbestos-containing products, which Defendants knew or in the exercise of ordinary care should have known, and/or had reason to know, were imminently and inherently dangerous, defective, and otherwise highly harmful to Plaintiff Patrick A. Laughlin and others exposed to asbestos dust, fibers and/or particles resulting from the intended, ordinary and foreseeable use of their asbestos-containing products;" and that JCI "failed to take reasonable precautions or to exercise reasonable care to adequately or sufficiently warn the Plaintiff, Patrick A. Laughlin" in a number of itemized ways "of the dangers and harm to which he was exposed as a consequence of the inhalation of asbestos dust, fibers and/or particles resulting from the intended, ordinary and foreseeable use of their asbestos-containing products." And Plaintiffs pled that the "negligent and deliberate acts of the Defendants proximately resulted in Plaintiff Patrick A. Laughlin's inhalation of asbestos dust, fibers and/or particles from the intended, ordinary and foreseeable use of Defendants' asbestos-containing products," and "this exposure directly and proximately" caused Laughlin to contract the fatal disease of mesothelioma. Finally, Plaintiffs pled that these actions and omissions on the part of the defendants were "willful or wanton in nature, were undertaken with actual or constructive knowledge that injury would result, and/or were accomplished with such recklessness as to evince a conscious disregard for the health, safety, and rights of [Laughlin]." (ECF 70, Plaintiffs' First Amended Complaint, at 26-32 (filed in *Laughlin*'s matter, Case No. 4:18cv134, prior to it being consolidated with the *Johnson* matter)).[10]

---

[10] JCI attempts to argue in its motion that because Plaintiffs never attempted to amend their complaint to a survival claim after Mr. Laughlin's passing, such claims are unavailable. (ECF 362, at 4). However, JCI's arguments are nonsensical in relation to Plaintiffs' arguments above that Mr. Laughlin's claims survive his death and that anything a seaman could pursue while alive, his estate can pursue after death. This was also noted in Plaintiffs' motion and memorandum asking the Court to substitute parties after Mr. Laughlin's death, which the Court granted. (*See* ECF Nos. 320, 321, and 325).

"Because only the legal sufficiency of the complaint, and not the facts in support of it, are tested under a Rule 12(b)(6) motion," courts must "assume the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations." *Fessler v. Int'l Bus. Machines Corp.*, 959 F.3d 146, 152 (4th Cir. 2020). And to survive a motion to dismiss, courts "require 'only enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Under this standard, Plaintiffs' allegations of fact, accepted as true, are sufficient to demonstrate that JCI knew asbestos from its products was imminently and unreasonably dangerous to Laughlin, but nevertheless deliberately, willfully, or wantonly failed to warn Laughlin in reckless disregard of his health and safety. This was sufficient on its face to apprise JCI of the claims against it and, if proven at trial, is sufficient to support a punitive damages verdict.

Finally, maritime punitive damages require proof of intentional or wanton negligence or a reckless disregard for the safety or health of the plaintiff. See *CEH, Inc. v. F/V Seafarer*, 70 F.3d 694, 699 (1st Cir. 1995). JCI knew about the hazards of asbestos in the 1940s, but never warned its customers for the next forty years in the face of mounting evidence of a hazard. Moreover, JCI put its head in the sand and never tested its finished products to determine whether they released free asbestos fibers. Indeed, not until JCI was sued in approximately 1980 did JCI have its litigation experts test its products—JCI still did not test its products itself. And when JCI decided it was too expensive to sell its asbestos products in the United States in 1985, it issued a memo stating that it would dump its products on foreign markets where asbestos was not regulated the way it is in the United States.

## **CONCLUSION**

For the foregoing reasons, this Court should deny JCI's Motion *in Limine* to Exclude

Plaintiff's Evidence of Nonpecuniary and Survival Damages.

Respectfully Submitted,

By: /s/ Hugh B. McCormick III
Of Counsel



Hugh B. McCormick, III, Esq. (VSB # 37513)
Robert R. Hatten, Esq. (VSB # 12854)
William W.C. Harty, Esq. (VSB # 45447)
Erin E. Jewell, Esq. (VSB # 71082)
Samantha P. Graham, Esq. (VSB# 93529)
Daniel R. O. Long, Esq. (VSB # 95873)
PATTEN, WORNOM, HATTEN & DIAMONSTEIN, L.C.
12350 Jefferson Avenue - Suite 300
Newport News, VA 23602
(757) 223-4500 Telephone
(757) 249-3242 Facsimile
pleadings@pwhd.com
HughMcCormick@pwhd.com
Counsel for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 7th day of February, 2022, I electronically filed the foregoing *Opposition to John Crane Inc.'s Motion in Limine to Exclude Plaintiff's Evidence of Nonpecuniary and Survival Damages* with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Eric G. Reeves, Esq.
Laura May Hooe, Esq.
Mary Lou Roberts, Esq.
Lisa Moran McMurdo, Esq.
**MORAN, REEVES & CONN, P.C.**
1211 East Cary Street
Richmond, VA  23219
Counsel for John Crane, Inc.

Brian James Schneider, Esq.
**SPOTTS FAIN, PC**
411 E. Franklin Street, Suite 600
Richmond, VA 23219
Counsel for John Crane, Inc.

Christopher O. Massenburg, Esq. (admitted *pro hac vice*)
**MANNING GROSS & MASSENBURG, LLP**
365 Canal Street, Suite 3000
New Orleans, LA 70130
Counsel for John Crane, Inc.

By: /s/ Hugh B. McCormick III
Counsel for Plaintiffs